Thomas H. HUBBARD and Frances H. Hubbard, Appellants,

v.

George CURTISS and Nancy Curtiss, and all other persons or parties unknown claiming a right, title, estate, lien or other interest in the real estate described in the Complaint in this action, hereby designated as Unknown Defendants, Appellees.

George CURTISS and Nancy Curtiss, and all other persons or parties unknown claiming a right, title, estate, lien or other interest in the real estate described in the Complaint in this action, hereby designated as Unknown Defendants, Cross-Appellants,

v.

Thomas H. HUBBARD and Frances H. Hubbard, Cross-Appellees.

Nos. 7310, 7491.

Supreme Court of Alaska.

May 18, 1984.

A. Lee Petersen, Anchorage, for appellants and cross-appellees.

Edward G. King, Ziegler, Cloudy, King, Brown & Peterson, Ketchikan, for appellees and cross-appellants.

1. See diagram *infra* p. 845.

Before BURKE, C.J., and RABINO-WITZ, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MATTHEWS, Justice.

This case involves three parcels of land located in the city of Kupreanof, formerly known as West Petersburg, which is located directly across the Wrangell Narrows from the city of Petersburg. The three parcels, Lot 12, Lot 13, and United States Survey 2480, are all located in Section 28, Township 58 South, Range 79 East, Copper River Meridian, Alaska. The Hubbards and the Curtisses claim ownership of a house and the grounds surrounding it which we refer to as the curtilage. The house is on Lot 12 and some of the curtilage is on Lot 13.[1] Although numerous issues are raised on appeal and cross-appeal, the proper application of the law of adverse possession to the undisputed facts is determinative.

## FACTS

In the late 1930's, Chris and Nina Dahl acquired a parcel of unpatented property. That parcel included what subsequently became Lot 12 and Lot 13. In 1941, the Dahls sold a portion of their property, the portion north and east of the Dock Path, to Earl Ullerick. In 1944, the Dahls sold the remaining portion of their property, the portion south and west of the Dock Path, to Frank and Barbara Rozich. The property sold to the Roziches included the house involved in this case.

In 1951, the Roziches applied for and were granted a patent to what is now Lot 13. Although Section 28 in which Lot 12 and Lot 13 are located was physically surveyed in 1936, no physical survey was accomplished for Lot 12 or Lot 13. Their boundaries as described in the patent were determined from projection or protraction of known angles and distances. Thus, the Roziches' patent describing the property as Lot 13 had geometrically determined

boundaries with no regard for what were the intended boundaries. In fact, the boundaries of Lot 13 did not encompass the house. Instead, it was located on Lot 12. However, at no time were the Roziches aware of this fact and it is undisputed that the Dahls intended to transfer the parcel south and west of the Dock Path that included the house to them.

In 1957, the Roziches sold their property to Jerry Brown. In 1963, Brown sold the property to Leroy and Margaret Boogard. Again, the Boogards believed they were receiving the property south and west of the Dock Path that included the house. The Boogards lived in the house from 1963 to early 1967 when they thought they sold the property to Stewart and Maryanne Nutter. The Nutters also believed they were receiving the property south and west of the Dock Path that included the house. The Nutters lived in the house for the remainder of 1967 and into early 1968. The problem with the transaction from the Boogards to the Nutters was that the Bank of Petersburg, in preparing all the documents, erroneously described the property as U.S. Survey 2480 (hereafter USS 2480), another property that the Boogards had

purchased in 1962, using the same bank as closing agent. Neither party was aware of the error at the time, and both acted according to their intentions.

In the spring of 1969, the Nutters sold the property to appellees, George and Nancy Curtiss. Although the Curtisses believed they were receiving the property south and west of the Dock Path, the property transferred was again erroneously described as USS 2480. Neither party was aware of the error at the time.

Summarizing the situation up to this point, we find the Curtisses holding record title to USS 2480 while believing they own the property south and west of the Dock Path that encompasses the house. The Boogards, thinking they hold title to USS 2480, actually retain ownership of Lot 13. Both parties believe Lot 13 includes the area south and west of the Dock Path that encompasses the house. In fact, Lot 13 has geometrically determined boundaries which do not encompass the house. The diagram below illustrates the locations of the pertinent properties and the portion of Lot 13 now claimed by the Curtisses.

WRANGELL NARROWS

We now return to the other portion of the property originally sold by the Dahls to Ullerick, i.e., the property north and east of the Dock Path. In 1942 Ullerick sold the property to John Hammer who in turn sold it to Frank Rayner. In 1952 Rayner applied for and was granted a patent to his property. The patent described the property as Lot 12. Again a problem was created as the geometrically determined boundaries did not reflect the boundaries intended. Lot 12 encompasses the house, but the common understanding was that the Dock Path was the southwest boundary to Lot 12, thereby placing the house on Lot 13. At this time, no one was aware of the boundary discrepancies.

Subsequently, Rayner sold the property to A.W. and Donna Goldsbury, who in turn sold it to Michael and David Weeks. In 1973 the Weeks sold the property to the Curtisses. All predecessors in interest to Lot 12 believed the Dock Path was the common boundary between Lot 12 and Lot 13. But, the Curtisses knew in 1970 that the Dock Path was not the common boundary and that the house was located on Lot 12.

In 1974 the Curtisses consulted their attorney regarding a right-of-way problem involving their property. At that time they learned that they owned USS 2480 rather than Lot 13. Later that year Margaret Yoss, formerly Boogard, also discovered the bank's error. Mrs. Yoss attempted to solve this problem by offering to exchange deeds with the Curtisses, but they rejected the offer. In November of 1974, an attorney retained by Yoss informed the Curtisses that Yoss claimed ownership of the house by virtue of the deed she held to Lot 13.

In 1976 Yoss hired appellants Thomas and Frances Hubbard to manage Lot 13. Pursuant to Yoss's instructions, the Hubbards rented out the house in June of 1977. Upon the Curtisses' request, the renters were ejected by State Troopers. Another attempt by the Hubbards to rent out the house ended in similar fashion, but Mr. Hubbard was also arrested and charged with misuse of another's property. The charges were later dismissed. These events prompted Yoss to hire John W. Bean, a licensed surveyor, to run a survey to determine the location of property lines. Bean's survey conclusively determined that the house was located on Lot 12, some five or six feet from the common boundary between Lot 12 and Lot 13. Until then Yoss had believed the common boundary was the Dock Path and that the house was located on Lot 13.

In 1978, the Hubbards bought Lot 13 from Yoss and, believing that the common boundary between Lot 12 and Lot 13 would be found to be the historical boundary, i.e., the Dock Path, the Hubbards entered the house with the intent to exercise dominion over it based on the deed to Lot 13. Mr. Hubbard was arrested again, but the charges were dismissed with the understanding that the matter would be resolved by this civil suit.

Summarizing the status of the three parcels involved, the Curtisses are record title holders to Lot 12 and USS 2480 and the Hubbards are record title holders to Lot 13. The Hubbards bought Lot 13 with the knowledge that Bean's survey determined that the house was located on Lot 12.

## PROCEEDINGS

On September 14, 1979, the Hubbards filed a complaint against the Curtisses. The complaint was in two counts. The first cause of action prayed that the court quiet title in the Hubbards to Lot 13. It also asked the court to establish the boundaries of Lot 13 in accordance with the historical boundaries, i.e., the Dock Path. The second cause of action prayed for delivery of possession of Lot 13 and damages for the wrongful withholding of possession. The Curtisses responded by denying the Hubbards' allegations and seeking an award of a portion of Lot 13 which was allegedly adversely possessed by them. The area claimed by the Curtisses is designated on the diagram above. It represents the front yard area of the house which was used by

the Curtisses and their predecessors in interest.

Trial by the superior court took place during January of 1981 in both Juneau and Petersburg. The court found in favor of the Hubbards on the first cause of action and quieted title as to Lot 13 in their favor. It dismissed the second cause of action as to Lot 12 and quieted title thereto in favor of the Curtisses. The court also fixed the boundaries of Lot 13 as "described in the United States patent deed of the land." The court concluded that the Curtisses' possession of the portion of the curtilage extending onto Lot 13 lacked the requisite adversity until November of 1974, when Mrs. Yoss discovered the error in the deeds, and that therefore they were not entitled to any portion of Lot 13 by reason of adverse possession.

We affirm as to Lot 12 and that portion of Lot 13 that lies outside the curtilage of the house, and reverse as to the curtilage that lies on Lot 13.

## DISCUSSION

■ The Curtisses claim that they have acquired title to the curtilage on Lot 13 by adverse possession.[2] The superior court concluded that, they were not entitled to any portion of Lot 13 by reason of adverse possession because their possession "lacked the requisite adversity until November, 1974." The court apparently agreed with the Hubbards' contention that since the Curtisses predecessors, the Nut-

ters, took possession of Lot 13 and the house thinking they had purchased it from Mrs. Yoss, their entry on the land was permissive and without hostility toward her. In finding that the Curtisses' possession did not become hostile until Mrs. Yoss became aware of the mistakes in the actual deeds transferred, and was rebuffed in her attempts to rectify the mistakes by an exchange of deeds with the Curtisses, the trial court seemed to consider the subjective intent of the parties to be controlling. As we shall explain below, this was error.

Alaska has two adverse possession statutes. Under AS 09.25.050[3] the statutory period is seven years when the possession is accompanied by a claim and color of title. In other cases, under AS 09.10.030[4] the statutory period is ten years.

■ Color of title exists only by virtue of a written instrument which purports to pass title to the claimant, but which is ineffective because of a defect in the means of conveyance or because the grantor did not actually own the land he sought to convey. *Karvonen v. Dyer*, 261 F.2d 671, 674 (9th Cir.1958). The supposed conveyance must accurately describe the land claimed and it is the description, not the physical use of the land by the claimant, that determines the boundaries of the land that may be acquired by adverse possession under color of title. *Lott v. Muldoon Baptist Church, Inc.*, 466 P.2d 815, 817–18 (Alaska 1970). In cases such as this one, when the land claimed is not the land de-

---

2. The Curtisses could have obtained through a timely action judicial reformation of the Boogard-Nutter deed and the Nutter-Curtiss deed to USS 2480, since the misdescription contained therein was caused by mistake. 3 Corbin, Contracts § 604 at 631 (1960); Restatement of Restitution § 160, comment k (1937). However, the court ruled that the Curtisses' refusal to exchange deeds to USS 2480 and Lot 13 with Yoss was an election which barred such an action. The Curtisses' election is an affirmance—a decision to treat a transaction which could have been reformed as valid. This terminated the Curtisses' right to seek reformation, and validated for the purposes of this case the mistaken Boogard-Nutter and Nutter-Curtiss deeds to USS 2480. *See* Restatement of Restitution § 68 (1937).

3. AS 09.25.050 states:

   The uninterrupted adverse notorious possession of real property under color and claim of title for seven years or more is conclusively presumed to give title to the property except as against the state or the United States.

4. AS 09.10.030 states:

   No person may bring an action for the recovery of real property, or for the recovery of the possession of it unless commenced within 10 years. No action may be maintained for the recovery unless it appears that the plaintiff, an ancestor, a predecessor, or the grantor of the plaintiff was seized or possessed of the premises in question within 10 years before the commencement of the action.

scribed in the deed, the doctrine of color of title does not apply and the ten year period of AS 09.10.030 must be met.

■ In order to acquire title to land by adverse possession, the possessor must show that his use of the land was continuous, open and notorious, exclusive and hostile to the true owner. *Peters v. Juneau-Douglas Girl Scout Council,* 519 P.2d 826 (Alaska 1974). We have stated that an objective test should be used to determine the existence of the requisite degree of hostility.

> The question is whether or not the claimant acted toward the land as if he owned it. His beliefs as to the true legal ownership of the land, his good faith or bad faith in entering into possession (*i.e.,* whether he claimed a legal right to enter, or avowed himself a wrongdoer), are all irrelevant.

*Id.* at 832. In other words, the fact that possession was taken under mistake or ignorance of the true boundary lines is immaterial.[5] *Norgard v. Busher,* 220 Or. 297, 349 P.2d 490 (Ore.1960).

■ The Hubbards argued, and the trial court held, that prior to the discovery of the misdescriptions in the deeds the occupancy of the Curtisses and their predecessors in interest was with the consent and permission of the legal owner. This argument misconstrues the nature of the hostility requirement. As we stated in *Peters v. Juneau-Douglas Girl Scout Council,* 519 P.2d 826, 833 (Alaska 1974):

> [M]ere acquiescence in their use of the land cannot constitute the kind of permission which would prevent the acquisition of title by adverse possession. The whole doctrine of title by adverse possession rests upon the acquiescence of the

owner in the hostile acts and claims of the person in possession.

(Citation omitted). The key difference between acquiescence by the true owner and possession with the permission of the true owner is that a permissive use requires the acknowledgement by the possessor that he holds in subordination to the owner's title. 7 R. Powell, The Law of Real Property ¶ 1014 at 721 (Rohan rev. ed. 1979); 3 Am. Jur.2d *Adverse Possession* § 36 (1962). The possession of a grantee is presumptively adverse to his grantor. *Merryman v. Bourne,* 76 U.S. (9 Wall.) 592, 600, 19 L.Ed. 683, 686 (1870). This presumption is logical because once the grantor has purported to convey property neither he nor his grantee believe that the grantee's possession is subordinate to the grantor's title.

In *Sorensen v. Costa,* 32 Cal.2d 453, 196 P.2d 900 (Cal.1948), the California Supreme Court considered similar issues. That case too arose from the appellant's discovery that the historic boundaries of the lots that he and his neighbors had been occupying for over forty years differed significantly from the descriptions in their deeds.[6] *Id.* at 902. The supreme court rejected the argument that the mutual mistake of the parties precluded a showing that the possession was hostile or adverse to the rights of the record owner. Citing many earlier California cases, Justice Traynor wrote:

> [I]t has been an established rule in this state that "Title by adverse possession may be acquired through the possession or use commenced under mistake...."

> Nor is there any merit to appellant's contention that if adverse possession may be based on a mistaken entry, the period of the statute of limitations runs only from the discovery of the mistake....

---

**5.** The opposite viewpoint, that entry onto land under the mistaken belief that the claimant owned it would preclude hostility and prevent possession from ever ripening into ownership, is held by a distinct minority of jurisdictions. *See* 7 R. Powell, The Law of Real Property ¶¶ 1015, 1016 (Rohan rev. ed. 1979); Annot. 80 A.L.R.2d 1171 (1960).

**6.** Appellant's deed described the west half of Lot 7, but his house was on the east half of Lot 8. Appellee's deed described the east half of Lot 7, but his house was on the west half of Lot 7. His neighbor's deed described Lot 6 but she had been in possession of the west half of Lot 7 and the east half of Lot 6.

Appellant also contends that the mutual mistake precludes respondent from showing that his possession and that of his predecessors was under "such circumstances as to constitute reasonable notice to the owner...." Appellant has evidently misconstrued the foregoing language to mean that a person claiming title by adverse possession must establish that the record owner knew of his own rights in the land in question. All the claimant must show, however, is that his occupation was such as to constitute reasonable notice to the true owner that he claimed the land as his own. The fact that the record owner was unaware of his own rights in the land is immaterial.

*Id.* at 905 (citations omitted). Our previous decisions are in accord with the view expressed in *Sorensen*. *See Penn v. Ivey*, 615 P.2d 1 (Alaska 1980); *Shilts v. Young*, 567 P.2d 769 (Alaska 1977); *Alaska National Bank v. Linck*, 559 P.2d 1049 (Alaska 1977). *Accord Ringstad v. Grannis*, 171 F.2d 170 (9th Cir.1948).

In this case it is apparent that the Curtisses' possession of the curtilage on Lot 13 was adverse to the Hubbards' and their grantor, Mrs. Yoss, from its inception. The only remaining question is whether the Curtisses were continuously in possession for ten years as required by AS 09.10.030.

Whenever the true owner reenters his land and reaffirms his title by ousting the adverse possessor, the statute of limitations is tolled and, if the adverse possessor has not already gained title to the land through his prior possession, he must recommence his adverse possession and his prior period of adverse possession counts for naught. *See* 7 R. Powell, *supra*, at ¶ 1014. Protests by the owner against the occupancy of his land by an adverse possessor, without an actual entry or other overt action by him, will not affect the continuity of the adverse possession because the owner will still be disseized of his property. *Armstrong v. Payne*, 188 Cal. 585, 206 P. 638 (1922); *Sowa v. Shaefer*, 38 Ohio App. 522, 175 N.E. 745 (1931).

It is almost universally accepted that successive adverse possessors may tack their periods of possession together to satisfy the statutory duration requirements, if privity exists between them. *Ringstad v. Grannis*, 171 F.2d 170, 174 (9th Cir.1948). Privity is created when circumstances surrounding a conveyance of land show that the grantor intended to transfer possession of the land not described in the deed and the grantee does, in fact, take possession of that land. *Id.*, III Amer. Law of Property § 15.10 (1952).

Applying these principles to the facts in this case, the Curtisses may tack the possession of their predecessors, the Nutters, to their own possession of the curtilage on Lot 13. The Nutters took possession of the disputed property in March of 1967 after their mistaken purchase of USS 2480 from Mrs. Yoss. As we previously explained, the mistake in description on the deed conveyed by Mrs. Yoss did not prevent the Nutters' possession from being adverse to her. The Curtisses remained in continuous adverse possession until the Hubbards actually rented the house and the tenant they procured moved into it in June, 1977. But title automatically vests in the adverse possessor at the end of the statutory period. *Babo v. Bookbinder Financial Corp.*, 27 Ariz.App. 73, 551 P.2d 63, 64 (1976); III Amer. Law of Property ¶ 15.14 (1952). Thus, the Curtisses, by tacking their possession to the Nutters', acquired good title to the curtilage on Lot 13 in March of 1977, and the actions of the Hubbards, as agents for the true owner of the house, came too late to effectively interrupt the adverse possession.

A similar analysis is applicable to the Hubbards' claim to that portion of Lot 12 which is south and west of the dock path and thus within the historic boundaries of Lot 13. Once the boundaries of Lots 12 and 13 were fixed in the original patent in 1951, the first and second occupants of the

house were, in fact, adversely possessing it vis-a-vis the record owner of Lot 12. In 1961 Jerry Brown acquired good title to the house by tacking his possession to that of his predecessors, the Roziches. When, in 1963, he sold Lot 13 to Mrs. Yoss and transferred possession of the house, she acquired the right to obtain by reformation Brown's title to the house, and her possession became adverse to his title. When the Nutters took possession of the house their possession became adverse to Brown's title. They could tack Mrs. Yoss' period of possession to their own. The Curtisses succeeded to the Nutters' interest and they may tack the Nutter-Yoss period of possession to their own. The Curtisses did not destroy the adversity of their possession by acquiring record title to Lot 12 in 1973 because their record title was not good as against Brown's title based on adverse possession. *Mugaas v. Smith,* 33 Wash.2d 429, 206 P.2d 332 (Wash.1949); 4 H. Tiffany, The Law of Real Property, § 1177 (3rd ed. 1975). The Yoss-Nutter-Curtiss ten year period of adverse possession ripened into title to the portion of Lot 12 in question in 1973. The Hubbards' claim to the property therefore fails.[7]

For these reasons we affirm the judgment so far as it quiets title as to Lot 12 in the Curtisses; we affirm the judgment so far as it quiets title in favor of the Hubbards as to that portion of Lot 13 which is not in the curtilage of the house; we reverse the judgment so far as it pertains to the curtilage on Lot 13 and remand for entry of a decree quieting title to that property in favor of the Curtisses.

7. There is authority that title acquired by an adverse possessor is transferred to a subsequent possessor by a defective deed without a reformation action so long as the intention to transfer is clear. *Connell v. Ellison,* 86 App.Div.2d 943, 448 N.Y.S.2d 580 (1982); *Watson v. Price,* 356 So.2d 625 (Ala.1978). We need not decide whether to adopt this rule in this case for its application would not change the result. Using this rule would mean that Yoss obtained title to the portion of Lot 12 in question from Brown and effectively conveyed it to the Nutters, who in turn effectively conveyed it to the Curtisses.

The puzzling question of whether the Curtisses' affirmance of the mistaken transfer of USS 2480 to the Nutters by Yoss would serve to void the Lot 12 transfer to the Nutters by Yoss need not be answered. If the affirmance did void the transfer then the Curtisses would acquire the portion of Lot 12 in question by adverse possession in the same way they acquired the curtilage on Lot 13. If the affirmance was not effective the Curtisses acquired good title by means of the defective deed and transfer of possession from the Nutters.