**TENALA, LTD., Appellant,**

v.

**Audrey FOWLER, as Personal Representative of the Estate of Sally C. Mayo, Appellee.**

**No. S–6820.**

Supreme Court of Alaska.

Aug. 2, 1996.

Eugene R. Belland, Fairbanks, for Appellant.

Ronald L. Baird, Office of Ronald L. Baird, Anchorage, for Appellee.

Before COMPTON, C.J., RABINOWITZ, MATTHEWS and EASTAUGH, JJ., and CARPENETI, J. Pro Tem.*

## OPINION

EASTAUGH, Justice.

### I. INTRODUCTION

Audrey Fowler, as personal representative for the Estate of Sally Mayo (Mayo), brought this action to quiet title to land bordering the west, south, and east sides of a lot located on Fifth Avenue in Fairbanks. There are two main lots involved in this dispute, one of

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

which, Lot 5, is subdivided into four sub-lots. Mayo holds record title to one of the sub-lots, Lot 5C. Tenala, Ltd., (Tenala), holds record title to the three remaining sub-lots (Lots 5A, 5B, & 5D) and the other main lot, Lot 6. Fowler claims adverse possession of portions of Lots 6 and 5D and claims a disputed strip between Lots 5C and 5B. The superior court found for Fowler and Tenala appeals. We affirm in part and reverse in part.

## II. FACTS AND PROCEEDINGS

### A. The Facts

The lots at issue here are Lots 5 and 6, Block 76, Fairbanks Townsite. The parties agree that Mayo holds title to Lot 5C and that Tenala holds title to Lots 5A, 5B, 5D, and 6.[1] The three main contested areas consist of (1) a twelve to fifteen foot wide area of the eastern portion of Lot 6, running along the western border of Lot 5C from Fifth Avenue to a point just south of Lot 5C's southern border; (2) a strip (the "disputed strip") between Lots 5C and 5B, running north-south the length of Lot 5C, having a width of approximately 3.45 feet along Fifth Avenue, and abutting the north boundary of Lot 5D for a distance of approximately 7–9 feet; and (3) an area to the south of Lot 5C, encroaching onto Lot 5D.

All of Lot 5 was owned at one time by Hosea Ross. Hosea Ross transferred Lot 5C to Sally Mayo in a 1940 deed. Ed Ross had previously given Lee Mayo, Sally Mayo's husband, a 1927 deed for all of Lot 5. No documents show that Ed Ross had any interest in Lot 5 when he conveyed it to Lee Mayo.

Tenala is a closely held corporation. Its chain of title to Lot 5 traces back to Hosea Ross via Russell Beaverson, then-president of Tenala, who transferred Lots 5A, 5B, and 5D to Tenala in 1961 and 1962.[2]

It is undisputed that Hosea Ross's transfers of parts of Lot 5 left two small areas that were not conveyed to either Mayo or to Tenala's predecessors in title. The first is the disputed strip between Lots 5C and 5B. The second is a triangle about 1.8 feet wide between Lot 5C's southern border and Lot 5D's northern border.[3]

The Mayos moved into an existing cabin on Lot 5C in 1926. The existing structures slightly encroached onto Lot 6, and an addition and a coal shed built by the Mayos further encroached onto Lot 6 and Lot 5D.[4] The coal shed was built to the south of the cabin, and a vegetable garden was planted immediately to the east of the coal shed. At some point someone constructed a fence that extended in a easterly direction from the northeast corner of a shed to the south of the Mayo coal shed (hereinafter the "east/west fence"). This fence divided the portions of Lot 5 used by the Mayos from those used by their neighbors to the south. This fence lies 8 to 9 feet south of Lot 5C, and thus encroaches on Lot 5D.

When the Mayos moved onto Lot 5C, a garage was located on Lot 6. The Shermer family then owned Lot 6 and the garage. Between the garage and Lot 5C there was a strip of land more than 15 feet wide that the Mayos used to chop wood, store garbage cans, and park cars. The Mayos also used this area as a driveway for access to their coal shed and the rear of their cabin. While they owned Lot 6, the Shermers used the garage and occasionally also used the 15-foot strip to its east for access to the rear of the garage. During a 1986 repaving project, the City of Fairbanks installed an asphalt ramp

---

1. Appendix A depicts the lots and the disputed boundaries. Lot 5 is shaped roughly like an upside down "L", and borders on both Fifth and Sixth Avenues. Lot 6 is rectangular, runs along the western border of Lot 5, and fronts on Fifth and Sixth Avenues. Lot 5C is located in the northwest corner of Lot 5; Lot 5D is south of Lot 5C and Lot 5B is east of Lot 5C and 5D. Lot 5A comprises the northeast corner of Lot 5.

2. In 1962, Beaverson also transferred Lot 6 to Tenala.

3. The trial court presents a thorough analysis of how these gaps were created in the chain of title. *Fowler v. Tenala, Ltd.*, No. 4FA–91–383 CI, 8–11 (Alaska Super., January 25, 1994).

4. An "as-built" plot plan created after Sally Mayo's death indicates that the southwest corner of the cabin addition encroaches onto Lot 6 by up to 2 feet and the coal shed encroaches about 3 to 4 feet onto Lot 6 and about 8 to 9 feet onto Lot 5D.

between Fifth Avenue and the driveway on Lot 6. The Mayos have continuously used this strip since 1926.

Additionally, when the Mayos moved onto Lot 5C they treated as their own two cabins located east of Lot 5C. These cabins remained in existence until at least 1940.

 Tenala gradually removed old structures on its parcels. The trial court found that the garage on Lot 6 was removed before 1965 but after 1961. Additionally, two log cabins on Lot 5B were removed between 1940 and 1965. In 1965, a house on Lot 5B was also removed. In the mid–1970s, Tenala cleared and planted grass on a portion of Lot 5B and used that area as a volleyball court. To protect the Mayos' garden from stray volleyballs, Lee Mayo constructed an additional fence (the "north/south fence") running in a northerly direction from the existing east/west fence.[5] The extent and nature of the Mayos' use of Lot 5C and the surrounding property has remained largely unchanged since 1965.

### B. *The Proceedings*

Fowler, as representative of Sally Mayo's estate, brought a quiet title action against Tenala in 1991. After a three-day bench trial, the court held that under AS 09.10.030 Mayo had adversely possessed the eastern fifteen feet of Lot 6 abutting Lot 5C and a northern portion of Lot 5D. The trial court also held that Mayo had adversely possessed the disputed strip between Lot 5C and Lot 5B under color or claim of title pursuant to AS 09.25.050. The court stated that title to the disputed strip vested in the Mayos in 1934 and that Tenala had failed to prove that it subsequently adversely possessed this area away from Mayo pursuant to AS 09.10.030.

The court entered judgment quieting title, to which it attached a survey of the redefined Mayo parcel. The judgment dismissed Tenala's counter- and cross-claims with prejudice. Fowler sought attorney's fees and costs. She was awarded attorney's fees of $13,730 and costs of $1,927.75.

### III. *DISCUSSION*

A. *With the Exception of the Actual Building Encroachments, Mayo Lacked the Requisite Exclusivity to Adversely Possess the Eastern Portion of Lot 6; Therefore, Mayo Has Earned a Fee Simple Estate to the Areas Encroached by the Buildings and a Prescriptive Easement to the Remainder of the Claimed Land in the Eastern Portion of Lot 6.*

 Alaska has two adverse possession statutes, AS 09.10.030 and AS 09.45.052 (formerly AS 09.25.050). Alaska Statute 09.10.030 contains the general adverse possession provision:

No person may bring an action for the recovery of real property, or for the recovery of the possession of it unless commenced within 10 years. No action may be maintained for the recovery unless it appears that the plaintiff, an ancestor, a predecessor, or the grantor of the plaintiff was seized or possessed of the premises in question within 10 years before the commencement of action.

AS 09.10.030 (amended 1994). Alaska Statute 09.10.030 is not just a statute of limitations, but can also be used as the basis for establishing new title through adverse possession. *Ayers v. Day & Night Fuel Co.*, 451 P.2d 579, 581 (Alaska 1969). The other adverse possession statute, AS 09.45.052, allows claimants with color of title to establish legal

---

**5.** Tenala contends that this fence was not built in the 1970s, but rather "in all probability" dates to 1940 and was built by Hosea Ross. The trial court, however, accepted Fowler's testimony regarding the purpose and date of the fence. We only set aside a trial court's factual findings if we determine them to be clearly erroneous. *Peters v. Juneau–Douglas Girl Scout Council*, 519 P.2d 826, 833 (Alaska 1974) (citing *Ayers v. Day & Night Fuel Co.*, 451 P.2d 579, 582 (Alaska 1969)). "A finding is clearly erroneous when, although there may be evidence to support it, we are left

with the definite and firm conviction on the entire record that a mistake has been committed." *Id.* (quoting *Alaska Foods, Inc. v. American Mfrs. Mut. Ins. Co.*, 482 P.2d 842, 848 (Alaska 1971)). When a trial court's decision of a factual issue depends largely on conflicting oral testimony, the trial court's competence to judge credibility of witnesses provides even a stronger basis for deference by the reviewing court. *See Penn v. Ivey*, 615 P.2d 1, 3 (Alaska 1980) (citations omitted). The trial court's findings with respect to this fence are not clearly erroneous.

title after passage of a shorter period, seven years.[6] Because Fowler is not claiming the eastern portion of Lot 6 under a color of title theory, her claim to Lot 6 is governed by AS 09.10.030.

 In *Peters v. Juneau–Douglas Girl Scout Council*, 519 P.2d 826, 832 (Alaska 1974), we stated that the purpose of the requirements for adverse possession is to put the true owner on notice of an adverse possessor's claim. Towards this end, the exclusivity and continuity of an adverse possessor's use of a disputed area must only rise to that level which would characterize an average owner's use of similar property. *Nome 2000 v. Fagerstrom*, 799 P.2d 304, 309 (Alaska 1990). The level of use also determines whether a claimant acquires a fee title estate via adverse possession or merely a prescriptive easement.[7] According to Professor Cunningham:

> The chief distinction is that in adverse possession the claimant occupies or possesses the disseisee's land, whereas in prescription [the claimant] makes some easement-like use of it....
>
> . . . . .
>
> The most basic difference is between 'use' and 'possession', for that determines whether activities that are adverse will gain an easement or estate for the claimant. Usually it is obvious whether the activity is only use, such as passing over land, or possession, marked by occupation, fencing, or permanent improvements.

Roger A. Cunningham, et al, *The Law of Property* § 8.7, at 451–52 (2d ed. 1993). Cunningham further explains that

maintaining ... a paved driveway is usually treated as a prescriptive use, but its permanent, continuous, and substantial nature might lead a court to consider it possessory.... *It seems the test should flow from the principle that possession implies not only the possessor's use but his exclusion of others, while use involves only limited activities that do not imply or require that others be excluded.*

*Id.* at 452 (emphasis added) (footnotes omitted).

 The Mayos' actual building encroachments onto Lot 6 were continuous, open, and adverse, and represent permanent physical improvements to the land that required the exclusion of others. Therefore, we find that Mayo acquired a fee simple estate to the areas of encroachment.

 Apart from the slight building encroachments, the Mayos used the eastern portion of Lot 6 for access to the rear of the house and the coal shed, garbage can storage, and an unimproved driveway. Fowler concedes that the Shermers, Tenala's predecessors in interest in Lot 6, also occasionally used this area for access to the rear of the Shermers' garage. Other than the slight building encroachments, the Mayos never placed any permanent improvements on Lot 6 and never fenced or posted the area as their own. Nothing in the Mayos' use of Lot 6 can be interpreted to have given notice to the true owners that the Mayos were claiming a possessory interest in the driveway strip.[8] Consequently, if the Mayos met the

---

**6.** AS 09.45.052(a), in relevant part, states:

> The uninterrupted adverse notorious possession of real property under color and claim of title for seven years or more is conclusively presumed to give title to the property except as against the state or the United States.

**7.** The other requirements for a prescriptive easement are the same as those for adverse possession. *McGill v. Wahl*, 839 P.2d 393 (Alaska 1992) ("To establish a prescriptive easement a party must prove (1) the use of the easement was continuous and uninterrupted; (2) the user acted as if he or she were the owner and not merely one acting with the permission of the owner; and (3) the use was reasonably visible to the record owner. These are the same requirements

to make out a claim of adverse possession." (citations omitted)).

**8.** In *Fagerstrom* and *Peters*, we held that the claimants' uses rose to the level of an average owner and thus gave notice to the true owner. Unlike Mayo, however, the claimants in *Fagerstrom* and *Peters* placed physical improvements on the disputed property and staked off the boundaries of their claims. *Fagerstrom*, 799 P.2d at 307; *Peters*, 519 P.2d at 828. Furthermore, the claimants' uses were more extensive in those cases. *See, e.g., Fagerstrom*, 799 P.2d at 307–08 (indices of claim include: boundaries staked off; subsistence base camp use; picnic area with gravel pit, chairs, and barrel stove; placement of camper home; construction of outhouse and fish rack; and planting of trees); *Pe-*

other requirements of continuous, uninterrupted, open, and adverse use, the interest in the unimproved driveway area of Lot 6 to which Fowler is entitled is a prescriptive easement, and not fee title.

Tenala does not dispute that the Mayos have continuously and openly used, without interruption, the eastern portion of Lot 6 as a driveway since 1926. However, Tenala argues that this use was permissive. Therefore, the adversity of this use is the only open issue.

 We have held that there is a presumption that use by an alleged easement holder is permissive. *City of Anchorage v. Nesbett,* 530 P.2d 1324, 1330 n. 16 (Alaska 1975). This presumption is overcome by proof of a distinct and positive assertion of a right hostile to the owner of the property. *Id.* In *Swift v. Kniffen,* 706 P.2d 296, 304 (Alaska 1985), we stated that "[t]he hostility element turns on the distinction between acquiescence and permission," and held that if the true owners merely acquiesce, and do not intend to permit a use, the claimant's use is adverse and hostile. Therefore, we must decide whether the record reveals that Tenala intended to permit the Mayos' use or merely acquiesced in that use. In *Hubbard v. Curtiss,* 684 P.2d 842, we stated that "[t]he key difference between acquiescence by the true owner and possession with the permission of the true owner is that a permissive use requires the acknowledgment by the possessor that he holds in subordination to the owner's title." *Id.* at 848 (citations omitted).

 At trial, not only was there no evidence the Mayos were given formal permission to use the driveway, an officer of Tenala testified that the issue of the Mayos' use was never discussed with the Mayos. On direct testimony, Eugene Belland stated that he was aware of the Mayos' use and had never talked to Lee or Sally Mayo about it.[9] Belland's testimony is characteristic of acquies-

cence, rather than an affirmative intent to grant permission to continue the long-term use which predated Tenala's ownership. Statements made by Tenala to this court further support a conclusion that Tenala acquiesced in rather than intentionally permitted the Mayos' use. Tenala asserted in its opening brief that "as a successor to Shermer, [Tenala] respected the uses by Sally Mayo thus allowed and arising during Shermer's ownership and did not interfere with Sally Mayo's exercise of the same." Nothing in the record contradicts the evidence of acquiescence. We consequently find that the requisite adversity existed and that Fowler, as representative of her mother's estate, acquired a prescriptive easement to the portion of the easterly fifteen feet of Lot 6 which is not improved by the Mayos' buildings, and acquired a fee simple estate to those areas of physical encroachments.

B. *The Superior Court Did Not Err in Holding that Mayo Adversely Possessed the Disputed Strip between Lot 5B and Lot 5C.*

 Fowler claims adverse possession of the disputed strip between Lot 5C and 5B under color of title from the 1927 Ed Ross–Lee Mayo deed. Alaska Statute 09.45.052 dictates that a claimant with color of title may adversely possess a piece of property by holding it without interruption for seven years, if possession is adverse and notorious. *Shilts v. Young,* 567 P.2d 769, 775 (Alaska 1977). We have explained the color of title doctrine in the following way:

> The function of the doctrine of color of title is to define the exact boundaries of the land which is claimed. When one adversely possesses land under color of title the extent of the land possessed is measured by the terms of the purported instrument giving color of title rather than by actual physical use by the claimant.

ters, 519 P.2d at 828–29 (indices of claim include: physical improvements; placement and replacement of boundary markers; regular and extensive weekend use, as well as living on the property during seal season; construction of improvements to process and smoke fish; boat repair activities; deer hunting and clam digging; and planting a garden).

9. Belland testified that he was the "major operating officer" of Tenala and that when he stated that the Mayos' use did not bother him, he was speaking as an officer of the corporation.

*Lott v. Muldoon Road Baptist Church, Inc.,* 466 P.2d 815, 817–18 (Alaska 1970) (footnotes omitted). The color of title doctrine presupposes invalidity of the instrument under which a claim is brought. *Id.* Therefore, Fowler is not required to establish that Ed Ross had any interest to convey in the 1927 deed to Lee Mayo.

 The superior court found that Mayo, pursuant to AS 09.45.052, had acquired title to the disputed strip by 1934. The issue of the Mayos' use of the disputed strip is a factual question which we review under the clearly erroneous standard. *Peters,* 519 P.2d at 833. The application of legal doctrines to the facts, however, presents questions of law which we review independently. *Id.* at 834. Uncontested evidence was presented at trial that the Mayos treated the cabins on Lot 5B as their own until they were removed, sometime between 1940 and 1965. The court found that the Mayos continuously used the disputed strip from 1927, and that "the parties presented no evidence that anyone in the seven years between 1927 and 1934 made a claim to this land adverse to the Mayo family." The court also found that the Mayos paid taxes on the disputed strip since 1940. Furthermore, in finding that the Mayos openly claimed the disputed strip, the court noted an incident when May Butler, Sally Mayo's daughter, advised Belland that the area he was mowing was part of the Mayo lot. The court's factual findings are not clearly erroneous.

Based on the evidence before it, the superior court concluded that there was clear and convincing evidence that the Mayos had "openly treated the 'disputed strip' as their own land" and had acquired title under color or claim of title based on the 1927 deed to Lee Mayo.[10] We find that the superior court did not err in holding that the Mayos' use was sufficiently exclusive, hostile, and notorious to adversely possess the disputed strip.

 As the superior court correctly noted, because the Mayos acquired title via adverse possession in 1934, the relevant question is whether Tenala subsequently acquired title to this area through adverse possession. In holding that Tenala had not adversely possessed the disputed strip away from the Mayos, the superior court noted that the Mayos had paid taxes on the disputed strip since 1940 and had treated it as their own since 1927, that Tenala had made no claim to the strip prior to the lawsuit, and that Tenala had never held legal title or color of title to the strip. Given these facts, the superior court held that Tenala had failed to present clear and convincing evidence of adverse possession.

Tenala argues that the superior court erred in holding that Tenala had made no claim to the disputed strip prior to this lawsuit. Tenala points to the following conduct as indicating Tenala's claim to this parcel: rototilling and seeding the area in 1967, mowing the lawn, and using part of it as a volleyball court. Tenala also argues that it responded to the claim by May Butler by escorting her to the fence line and informing her that the north/south fence represented

**10.** Tenala argues, however, that the superior court failed to consider a 1922 deed, recorded in 1933, from the City of Fairbanks to William Gertz. Tenala asserts that the recording of this deed was a hostile act that destroyed Mayo's color of title claim. Tenala offers no support for the contention that the recording of a deed is a sufficiently adverse act to destroy a color of title claim. When an argument is cursorily treated and unsupported by citation to legal authority we consider it waived. *A.H. v. W.P.,* 896 P.2d 240, 243 (Alaska 1995) (arguments that pro se appellant inadequately briefed and failed to support with citations to legal authority treated as abandoned); *Forquer v. State,* 677 P.2d 1236, 1238 n. 2 (Alaska 1984) (appellants waived issues for which they failed to adequately develop both their arguments and the record to enable the court to adequately address them); *Wernberg v.*

*Matanuska Elec. Ass'n,* 494 P.2d 790, 794 (Alaska 1972) (arguments given only cursory treatment and unsupported by citations to legal authority considered abandoned); *Fairview Dev., Inc. v. City of Fairbanks,* 475 P.2d 35, 36 (Alaska 1970) (single conclusory paragraph without citation of any authority is not adequate to put an issue before the court), *cert. denied,* 402 U.S. 901, 91 S.Ct. 1374, 28 L.Ed.2d 642 (1971).

Because this asserted destruction of Mayo's color of title claim is the foundation for Tenala's argument that it acquired title to the disputed strip via the doctrine of strips and gores, this related theory of ownership must fail. Additionally, because Mayo acquired title through adverse possession in 1934, Tenala's claim under the quitclaim deeds procured shortly before trial from the heirs of Hosea Ross is also without merit.

the boundary line. These facts, however, do not rise to the level of clear and convincing evidence of use which is sufficiently hostile, continuous, open, and notorious to acquire title by adverse possession. Fowler testified at trial that, as a neighborly gesture, Tenala occasionally mowed the lawns of neighboring properties. Furthermore, weighing the conflicting testimony before it, the trial court found that the Butler/Belland incident supported the fact that the Mayos openly claimed this area. As we noted above, *supra* note 4, when faced with findings based on conflicting testimony, we have even a stronger basis for deferring to the trial court. *Penn*, 615 P.2d at 3. Consequently, we hold that the trial court did not err in concluding that Tenala had failed to carry its burden to show adverse possession of the disputed strip after 1934.

> C. *The Superior Court Did Not Err in Holding that Mayo Adversely Possessed a Portion of the Northern End of Lot 5D, but Erroneously Determined the South Boundary Line of the Mayo Lot.*

 Tenala does not dispute that the Mayos' physical encroachments and use of the northern end of Lot 5D possess the requisite characteristics for acquiring a fee simple estate; Tenala argues instead that the better public policy would be to award an easement.[11] Tenala's arguments are contrary to the existing law, which holds that fee simple title is acquired if all of the required elements of adverse possession are met. *See, e.g., Hubbard v. Curtiss*, 684 P.2d 842, 849 (Alaska 1984) (holding that title automatically vests in the adverse possessor at the end of the statutory period if all the requirements are met). The law has long recognized adverse possession as a legitimate method for acquiring title. *Alaska Nat'l Bank v. Linck*, 559 P.2d 1049, 1054 (Alaska 1977). In *Linck* we stated:

> While ... adverse possession statutes keep stale causes out of the courts, they serve other important public policies as

well. They exist because of a belief "that title to land should not long be in doubt, that society will benefit from someone's making use of land the owner leaves idle, and that third persons who come to regard the occupant as owner may be protected." *Id.* (citations omitted). Therefore, Tenala's arguments based on public policy are unfounded and unpersuasive.

Tenala additionally challenges the superior court's determination of the Mayos' south boundary line (as set by the court's finding of adverse possession). The court set the south boundary with reference to the small shed south of the Mayo coal shed. The superior court described the south boundary as follows:

> [B]eginning at the northeast corner of the small shed located south of the Mayo "coal" shed along a line extending westerly at the same angle and direction as the line denoting the north edge of the small shed until it intersects the west edge of the 15 foot "driveway" previously awarded to Mayo; and, again beginning at the northeast corner of the small shed along a line extending easterly at the same angle and direction as a line that connects the northeast corner of the small shed and the intersection of the "picket fence" [the east/west fence] and the "wood and wire fence," [the north/south fence] then from [this] intersection ... along a line extending easterly at the same angle and direction as the line that connects the northeast corner of the small shed and the intersection of the "picket fence" and the "wood and wire fence" until it intersects the east boundary of the dispute[d] strip awarded to Mayo as set forth below.

Tenala challenges this boundary line in two respects.

Tenala first argues that Fowler only claimed to the south line of the coal shed and not the additional approximately 2½ feet to the small shed. The superior court understood the area claimed by Fowler with respect to Lot 5D to be bounded by the east/west and north/south fences and described it

---

**11.** Tenala concedes that the Mayos' use of the northern portion of Lot 5D has "an exclusivity of use which could be construed as an exclusivity of possession under the Alaska case law, thus ripening into a fee title rather than a servitude."

as follows: "The area claimed is enclosed by a fence that runs easterly from a shed that is approximately two and one-half feet south of the 'coal' shed to a fence that runs north and south:" In support of its contention that this understanding was incorrect and that Fowler limited her claim to Lot 5D to the south line of the coal shed, Tenala cites statements made at trial by Fowler's attorney, Mr. Baird. These statements, taken in context, are consistent with an understanding that Fowler was claiming that portion of Lot 5D inside the fence which runs from the northeast corner of the small shed south of the coal shed.[12] Consequently, the trial court did not clearly err by using the small shed as the southerly demarcation of Fowler's claim.

Tenala next argues that Fowler has no claim to the portion of Lot 5D awarded in the court's judgment outside the area enclosed by the east/west and north/south fences. This challenge to the south boundary line set by the trial court concerns the court's determination that the area adversely possessed by the Mayos included a portion of Lot 5D east of the north/south fence. This area was included in the judgment awarded to Fowler because the superior court extended the south property line until it intersected with the disputed strip. Tenala argues that, because the north property line of Lot 5D marks the south boundary of the disputed strip, the disputed strip and the south property line as described by the court do not intersect. Tenala is correct.[13] As noted

above, during the trial the superior court explained that it understood the claimed area as being bounded by the east/west and north/south fences. Therefore, it was merely an oversight that the superior court defined the east end of the south property line as it did. Consequently, we hold that the south boundary line of the Mayos' fee simple estate starts at the northeast corner of the small shed located to the south of the Mayos' coal shed and extends easterly at the same angle as a line that connects the shed and the intersection of the east/west fence and north/south fence, then runs northerly along the line of the north/south fence until it intersects with the north property line of Lot 5D, and from this intersection extends northeasterly along the north property line of Lot 5D until this property line intersects with the eastern border of the disputed strip.[14]

### D. *Although Tenala Waived Any Argument with Respect to the Costs and Attorney's Fees Awards, We Vacate These Awards Due to Our Partial Reversal of the Trial Court and Remand Them for Re-evaluation in Light of Our Holdings.*

Tenala asserts that the superior court erred in awarding attorney's fees and costs, but makes no supporting arguments on appeal and merely refers us to its trial court memoranda on the issue. Therefore, Tenala has effectively abandoned these issues. *See Gates v. City of Tenakee Springs*, 822 P.2d

---

**12.** On four occasions at trial Baird characterized Fowler's claim to Lot 5D as being the area "to the rear of the coal shed." The first statement by Baird relied upon by Tenala indicates the intended meaning of this phrase. At trial Baird stated, "We are not making any claim under title or adverse possession to any area south of the fenced line and the rear of the coal shed." The fact that Baird qualified the fenced area as being to "the rear of the coal shed" indicates that he was not referring to the south wall of the coal shed, but rather was informally referring to the area south of the coal shed up to the fence line, i.e., the small shed. Other statements by Baird which Tenala contends indicate a limitation of Fowler's claim to the area to the rear of the coal shed can be interpreted consistently with this understanding.

**13.** The disputed strip was created when the area between Lots 5C and 5B was left unconveyed by

Hosea Ross. Lot 5D, however, was not left unconveyed but rather was included in a deed from Hosea Ross to C.M. Housler, a predecessor in interest to Tenala. The disputed strip does not extend southerly into Lot 5D, making the superior court's demarcation of the south property line physically impossible. Furthermore, although at one time Fowler asserted a claim to all of Lot 5, Fowler dropped any claim under color of title to that portion of Lot 5D not enclosed by the east/west and north/south fences.

**14.** We note that the western edge of the south property line as set forth by the superior court is also altered due to our holding that Mayo did not acquire a fee simple estate to the eastern fifteen feet of Lot 6. While the south property line of Mayo's fee simple title ends at the western border of Lot 5D, the southern boundary of Mayo's prescriptive easement extends in a westerly direction for fifteen feet.

455, 460 (Alaska 1991) (treating issues cursorily or not addressed in a party's appellate briefs as abandoned) (citing *Lewis v. State,* 469 P.2d 689, 691–92 (Alaska 1970)). This court need not consider arguments which a party on appeal merely adopts and incorporates by reference to its lower court memoranda. *Bidwell v. Scheele,* 355 P.2d 584, 587–88 (Alaska 1960).

Nonetheless, because we have found that Fowler, as representative of her mother's estate, acquired a prescriptive easement and not fee title for most of the disputed portion of Lot 6, we vacate the attorney's fees and costs awards. On remand, the trial court will have to decide who is the prevailing party. The prevailing party determination is left to the discretion of the trial court, *LeDoux v. Kodiak Island Borough,* 827 P.2d 1121, 1124 (Alaska 1992), as is the award of costs. *Pavone v. Pavone,* 860 P.2d 1228, 1233 (Alaska 1993).

E. *On Remand, the Dismissal of Tenala's Counter- and Cross–Claims Should Be Made To Be Without Prejudice.*

Tenala argues that its counter- and cross-claims should have been granted at least with respect to Lots 5A and 5B and that portion of Lot 5D not enclosed by the east/west and north/south fences. Fowler responds that Tenala waived this argument by failing to raise it below. We have held that we will decline to review issues that are not raised at the trial court, except to the extent that they may constitute plain error. *Miller v. Sears,* 636 P.2d 1183, 1189 (Alaska 1981). "Plain error exists where an obvious mistake has been made which creates a high likelihood that injustice has resulted." *Id.* (citing *City of Nome v. Ailak,* 570 P.2d 162, 171 (Alaska 1977)).

An involuntary dismissal with prejudice is a harsh sanction which should only be applied in extreme cases. *Power Constructors, Inc. v. Acres Am.,* 811 P.2d 1052, 1055 (Alaska 1991); *Zeller v. Poor,* 577 P.2d 695, 697 (Alaska 1978); *Mely v. Morris,* 409 P.2d 979, 982 (Alaska 1966). While Tenala did not ask for affirmative relief on its counter-claims and did not pursue its cross-claims, no prejudice to Fowler or the other defendants was shown. Therefore, we hold that it was plain error to dismiss Tenala's counter- and cross-claims with prejudice. We reverse the trial court's decision and remand with instructions that these claims be dismissed without prejudice.

## IV. CONCLUSION

For these reasons, we AFFIRM in part and REVERSE in part. We AFFIRM the holding that Mayo adversely possessed the areas of actual building encroachments in Lot 6 and acquired a fee title interest to these areas. We REVERSE the holding that Mayo adversely possessed the remaining easterly fifteen feet of Lot 6 and REMAND for entry of judgment giving Mayo a prescriptive easement to that part of Lot 6 for use as a driveway and storage area and for correction of the judgment to reflect these changes in the western boundary of Mayo's property. We AFFIRM the superior court's holding that Mayo, under color of title pursuant to AS 09.45.052(a), adversely possessed the disputed strip between Lots 5C and 5B. Likewise, we AFFIRM the superior court's finding that Mayo adversely possessed the fenced area of Lot 5D, but we REMAND so the judgment may be corrected to adjust the southern boundary of Mayo's property. We VACATE the attorney's fees and costs awards and REMAND for re-evaluation of these claims. Finally, we REVERSE the dismissal with prejudice of Tenala's counter- and cross-claims and REMAND with instructions that these dismissals be without prejudice.

## APPENDIX A

Copy of Exhibit 2 admitted in the trial court, the July 1993 as-built plot plan of Lot 5, modified by the addition of lot numbers and labeling of the disputed strip.

