*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JAMES DAULT and SHALA DOBSON, | ) ) ) | Supreme Court No. S-14328 |
| Appellants, | ) ) | Superior Court No. 3PA-10-01559 CI |
| v. | ) ) | O P I N I O N |
| EDWARD SHAW, | ) ) | No. 6847 – November 29, 2013 |
| Appellee. | ) ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Eric Smith, Judge.

Appearances: Richard Deuser, Law Office of Richard Deuser, Wasilla, for Appellants. DanaLyn Dalrymple, Dalrymple Law, P.C., Palmer, for Appellee.

Before: Carpeneti, Chief Justice, Fabe, Winfree, and Stowers, Justices, and Matthews, Senior Justice.*

MATTHEWS, Senior Justice.
WINFREE, Justice, with whom STOWERS, Justice, joins, dissenting.

## I. INTRODUCTION

In the doctrine of adverse possession there is a presumption that the use of a private drive across the property of another is permissive and does not give rise to an

---

\* Sitting by assignment made under article IV, section 11 of the Alaska Constitution and Alaska Administrative Rule 23(a).

easement.  But the presumption does not apply where a drive was not originally established by the other property's owner for his or her own use.  The main question here is whether this presumption applies to the facts of this case.  We hold that it does because the drive at issue was constructed by the original subdivision developers for their own use.

## II.    FACTS AND PROCEEDINGS

### A.    The Subdivision And The Trail

Lots 4 through 40 of the North Shore Subdivision extend along the north shore of Blodgett Lake.  The subdivision was approved by the Matanuska-Susitna Borough in 1966.  The subdivision plat is attached as Appendix A to this opinion.  A ridge created by a lateral moraine bisects most of the lots so that they slope steeply down to the lake to the south and to what was originally swampy ground to the north.  All of the lots border a platted road on the north, North Shore Drive.  The lots are not large for a rural subdivision.  For example, lot 28, which is owned by appellants James Dault and Shala Dobson, extends along the lake shore for only some 88 feet, while the distance from the lake to North Shore Drive is about 210 feet.

When the lots in the subdivision were first offered for sale in the late 1960s North Shore Drive was not improved or readily passable.  The developers first tried showing the lots by boat.  Subsequently they bulldozed a trail along the ridge.  The superior court found that the purpose of this trail was "so that prospective buyers could gain access to the property."  The trail does not appear on the subdivision plat.  But by the time lots were sold, the deeds to most lots referred to the trail, reserving to the subdivision developers as grantors "an easement for right-of-way purposes twenty (20) feet in width and upon the North One-half (N 1/2) of said lot."  For reasons that are not explained, no reservation was made with respect to lot 28.

## B.    The Controversy

The trail is the source of controversy in this case.  The appellee, Edward Shaw, is the owner of lots 33 and 34 of the North Shore Subdivision.  Appellants Dault and Dobson (Dault) own lot 28.  The controversy came to a head in 2009.  Shaw had a house on lots 33 and 34 that was built by his predecessors in title, the Rices, more than 30 years earlier.  By 2009 North Shore Drive had been improved for many years and was fully passable.  But Shaw continued to use the trail as the access route to his house up to where it merged with North Shore Drive at lot 26.  The trail thus crossed lots 27 through 32, including Dault's lot 28.  In 2009 the only lot with a dwelling between the point of merger at lot 26 and Shaw's house was lot 32, where a cabin owned by Carol and Oliver Krein was located.  The Kreins also used the trail as their means of access to North Shore Drive.

Dault purchased lot 28 in 2006.  In 2009 in preparation for constructing a house on the lot, he built a driveway from his house site to North Shore Drive.  The trail merged with this driveway so that access along the trail to the lots to the west was not blocked.  Dault built a shed where the trail had been.  Shaw's house was not then occupied.  When Shaw's brother, Michael Shaw, discovered that a driveway was being constructed, he asked Dault about the project.  Dault assured Michael that the new driveway would provide safer access to Shaw's property, but Michael expressed concern over the lack of a Borough permit.  During a subsequent conversation, Dault said that he did not believe that he needed a Borough permit.  Michael had by then discovered the grantor easements on some of the lots, including his brother's, and based on them, told Dault to remove the obstruction from the trail.

Subsequently, Edward Shaw's attorney contacted Dault,  demanding that the trail be restored based on "the actual grant of easement in [Dault's] deed" and "the theory of prescriptive easement."  Dault responded, disputing both the existence of a

granted easement and the factual basis for an easement by prescription. Shaw then filed the complaint in the present case.

###### C. Pleadings And Motions

Shaw filed the complaint on May 12, 2010. It alleged that Shaw acquired his lots from his mother's personal representative in August of 2008, and that his mother, Alice Tauscher, acquired them from the Federal National Mortgage Association in 1988. The complaint alleged that there is a dwelling on the property, that access to the dwelling is "via an improved driveway running over and through a number of lots in the subdivision, including Lot 28" and that Shaw and his predecessors have utilized the driveway "openly, continuously, hostilely, and in an uninterrupted fashion for a period of time in excess of 10 years." The complaint's final allegation of fact was that Dault blocked the driveway and refused to reopen it. Shaw requested an injunction requiring Dault to reopen the driveway and a declaration that a prescriptive easement runs through Dault's property "in accordance with the defined and historical usage by [Shaw] and his predecessors-in-interest."

In his answer Dault admitted the existence of the trail, and his reconfiguration of it, but denied that the requirements for a prescriptive easement were satisfied. Dault also posed a number of affirmative defenses, including the availability of the public right of way bordering Shaw's property, estoppel, laches, and failure to join indispensable parties — referring to other lot owners whose property is traversed by the trail.

After some discovery was conducted, Shaw moved for what he termed a "Declaratory Judgment." This was understood by the parties and the court to be a motion for summary judgment. Shaw's memorandum in support of his motion related the ownership history of lots 33 and 34, in relevant part as follows. The subdivision plat was recorded by Helen Clements on September 7, 1966. On August 9, 1968, John and

Ina Boss and Louis and Mary Odsather (who other evidence established as the subdivision developers) deeded lots 33 and 34 to Herbert and Lalladge Rice. This deed was recorded on July 17, 1979. A trustee's deed to a mortgage company was recorded February 11, 1988. Shaw's memorandum noted that this presumably resulted from a foreclosure. In short order, the mortgage company conveyed the property to the Federal National Mortgage Association, which in turn sold it to Alice Tauscher by deed recorded October 14, 1988. Finally, as noted in the complaint, Tauscher's estate conveyed the property to Shaw in a deed recorded April 22, 2008.

According to Shaw, Tauscher occupied the property from the time of her purchase in 1988 until her death on August 25, 2007, with the exception of a six-week period in 1999. Shaw claimed to have also occupied the property as his principal residence at times, including the six-week period in 1999 when Tauscher did not live there. The property was rented from March 2008 until November 2008. Since then it has been vacant and listed for sale. At all times since Tauscher's initial purchase, the trail was the sole means of access to the house on the property.

Shaw's argument as set out in the memorandum supporting his motion was that the ten-year prescriptive period was satisfied by Tauscher's use of the trail from 1988 until her death in 2007, and for the additional year that it was used by renters. This use, Shaw argued, also served to satisfy the requirements of continuity and notoriety. As to the requirement of hostility, Shaw's memorandum stated:

> There is a fundamental presumption that the use of land by an alleged easement holder was permissive unless the claimant proves a distinct, positive assertion of a right hostile to the owner. However, the presumption does not arise if the roadway was not established by the owner of the servient estate for its own use but for many years was the means of passage to the dominant estate [citations omitted].

Shaw's memorandum went on to explain his view of why the presumption of permissiveness does not apply to this case:

> In this case, the driveway was evidently established by the owners of the house when the house was constructed in 1977. . . . The records of the State Recorder show that the owners at that time were Louis and Mary Odsather and John and Ina . . . Boss. There is no direct or circumstantial evidence that there was a structure on Defendant's Lot 28 during the period of time Plaintiff claims that the prescriptive easement arose, or that Defendants or their predecessors in interest constructed the driveway for their own use. . . . [T]he driveway was the only means of passage utilized by Plaintiff and his mother to the dominant estate, Lots 33 and 34.

Dault opposed Shaw's motion and filed a cross-motion for summary judgment. In support of his cross-motion, Dault presented multiple affidavits including affidavits from three long-time owners of lots in the subdivision who testified as to the circumstances surrounding the construction of the trail, and its intended uses.[1] Robert Dobson purchased lot 23 from the subdivision developers in 1968. In his affidavit, he stated that the developers created the trail to allow prospective buyers access to the property to facilitate sales, and that it was understood that the trail was only useable as a matter of convenience:

> 6.    . . . . When a particular lot owner wanted to develop his property, and therefore needed the space occupied by the access trail on the ridge line, it was understood that the lot owner could "knock down" the ridge line, thereby removing the access trail in the process.

> 7.    After lot development ended the trail on a particular lot, the idea was that anyone who had been using the access trail would be able to continue using the remaining parts of the access trail that still existed but would, if necessary or

---

[1]    The three affiants were Robert Dobson, Gordon Benedict, and Carol Krein.

desired, construct their own driveway, leading from the public right of way, as the way to drive to their lot.

8.    My neighbors have, over the years all understood this and agreed to this.  Any other understanding would have rendered many of the lots as unbuildable — no place to put improvements as the access trail occupied the only feasible place to put improvements.

9.    The realtor, John Boss of Totem Realty, who I bought my lot from, told me that the access trail was for convenience and that the public right of way would be the long term way to access lots in the subdivision.  This made the only sense because the lots would not be buildable if you couldn't build where the access trail was located.

Gordon Benedict testified in an affidavit that he had purchased lot 40 in 1970.  Like Dobson, he testified that the developers put in the trail to help with lot sales.  He stated that the trail was also a way to gain access to the ridge line in order to develop lots.  He understood that the "ridge line trail was not intended to be a permanent road.  If it were to remain in place, it would have destroyed the value of the lots as the area that was buildable would have been largely taken by the presence of the trail."  Benedict also testified that in approximately 1978 he began excavation work on his lot and also worked on lots 38 and 39.  Essentially, he pushed dirt from the ridge line toward North Shore Drive, thereby "taking down the hill" and, in the process, obliterating the trail.  He stated that around that time the Borough began to maintain North Shore Drive, including snow removal.  Benedict also testified that in the 90s Alice Tauscher called him about some changes being made to the trail by another lot owner, Bill Moll.  According to Benedict, Tauscher made no objection to the work, and Benedict had the impression that "she understood that when people wanted to develop their lots, that they could do so and the public right of way would then be used to travel to particular lots instead of using the access trail on the lot where the improvements were being made."

Carol Krein testified by affidavit that she and her husband purchased lot 32 in 1969. Krein testified that the agent they dealt with told her with respect to the trail that everyone eventually would have to put in their own driveway down to North Shore Drive. Krein also testified that she had discussed the trail with Tauscher on one occasion, during a conversation regarding an electric meter for Tauscher's house that was installed on the Krein property. According to Krein, Tauscher understood that

> the access trail was for convenience and when people wanted to use their lots, where the access trail was located, they would then build their own driveways off of the public right of way. [Tauscher] understood that she was crossing our private property and Glenna's (the next lot owner to the east) private property. We were good neighbors and let each other cross our private property on the access road. We were good neighbors and let her keep the electric meter on our lot.

According to Krein, "Tauscher did not object when various persons in the subdivision either eliminated or re-routed the access trail on their properties. Nor did we. We all understood the temporary and conditional nature of the access trail."

Dault's opposition to Shaw's summary judgment motion was wide-ranging.[2] But his main point was that the element of hostility is missing. He noted that

---

[2] Dault filed an affidavit in which he explains that he and Shala Dobson own and live on another lot in the subdivision, lot 35, which is adjacent to and west of Shaw's lots. Dault testified that preparatory to building a house there in 2004 he talked with Tauscher about bringing earthmoving equipment over the trail, since it is easier to "push down" than "push up." According to Dault, Tauscher initially agreed, but "as it turned out," he instead brought the equipment in from the public right of way and created a driveway to his house site by working up-slope. In the process he eliminated the trail on lot 35, just as development on lots 37-40 had eliminated it there. Why he did not bring equipment up over the trail was explained by Dault at trial. A few days after Tauscher agreed that Dault could bring equipment over the trail, Shaw told him that he could not.

In his affidavit, Dault also explained why the trail precludes lot
(continued...)

the trail was constructed by the developers of the subdivision and therefore "[t]he presumption of consent should apply." He summed up by stating, "the evidence presented by Defendants establishes that use of the access trail was by consent. Plaintiff had the burden on the issue of consent and offered no evidence that consent was absent."

Shaw filed a reply to Dault's opposition and cross-motion, claiming that the evidence was insufficient to show that Tauscher understood that her right to use the trail was temporary. Shaw filed his own affidavit stating that there was never a community understanding that the use of the trail would be temporary. Shaw's argument continued to rely on the premise that the presumption that a use is permissive does not apply and asserted that the burden of proof was on Dault to show that Tauscher's use was consensual. But Shaw did not contest the evidence presented by Dault that the trail was built by the subdivision developers, rather than, as Shaw had asserted in his opening memorandum, by the original owners of his house.

The superior court denied Shaw's motion for declaratory judgment and Dault's cross-motion for summary judgment. The court found that there were genuine issues of material fact that precluded summary judgment. Specifically, the court found that there were genuine issues as to whether the usage of the trail was permissive. The court noted that "[w]hether there was community understanding among the property owners that the use of the trail was permissive is a genuine issue of material fact." In addition, the court found that there were genuine issues as to the continuity and duration of Tauscher's use of the trail.

---

[2]      (...continued)
development. The drop off from the ridge line is steep, so the ridge must be leveled to some extent by pushing material north toward North Shore Drive. In addition, there is a 75-foot offset requirement from the lake shore as to buildings and 100 feet as to septic systems. Finally, there are specific distances that must be satisfied between wells and septic systems. These factors mean that the ridge is the only plausible house site.

## D. The Trial

The case proceeded to a bench trial which occupied parts of four days in March 2011. The evidence presented by Shaw relating to the continuity and duration of use of the trail by Tauscher was much the same as he had presented in affidavit form in his motion for declaratory judgment. But he did not present evidence that the trail was constructed by the original owners of his house.

The evidence presented by Dault was also similar to the evidence that he presented in his opposition to Shaw's motion and in support of his cross-motion for summary judgment. In particular, the evidence was undisputed that the trail was built by the subdivision developers to aid them in selling the property and to facilitate development of the property. Robert Dobson testified:

> When we bought . . . the property . . . they were glad to tell us that there was a trail that we could use to get up there . . . they put it in so we could get up and see our lots and use our lots. And there was not any indication that that's the way it was going to always be." Carol Krein similarly testified that "there was a . . . trail up along the ridge that was built to show all the property and our realtor took us over there and showed us the lots that were available.

Krein further testified: "[W]e were told when we bought it that that was a trail for the realtors and that eventually we would have to build our own driveway up from North [S]hore . . . ."[3]

---

[3] This aspect of Krein's testimony was objected to as hearsay, but the testimony was allowed on the grounds that it would serve as background for a conversation between Krein and Tauscher as to the temporary nature of the trail. The testimony was also admissible on the issue of the community understanding as to the nature of the trail. The court had ruled on summary judgment that this was a material issue in the case. Krein's testimony was covered by Evidence Rule 803(20), which excludes from the hearsay rule evidence of reputation in the community arising before

(continued...)

**E.     The Superior Court's Decision**

The superior court issued its decision in a 27-page written order.[4] The court found by clear and convincing evidence that Shaw proved that he had a prescriptive easement where the trail crossed lot 28. The court found that the continuity and ten-year duration elements of adverse possession were satisfied by Tauscher's use from 1988 through 2007. With respect to hostility, the court concluded that the general presumption that the use of land by an alleged easement holder is permissive did not apply. Instead, the court applied a presumption that the use of the easement was hostile. The court wrote:

> The Alaska Supreme Court set forth the applicable analysis relating to hostility in *McDonald*:
>
>> The hostility requirement, however, is "determined by application of an objective test which simply asks whether the possessor acted toward the land as if he owned it, without the permission of one with legal authority to give possession." Still, we will presume that the use of land by an alleged easement holder was permissive unless a claimant proves "a distinct and positive assertion of a right hostile to the owner." But this presumption does not arise if "a roadway was not established by the owner of the servient estate for its own use but was for many years the only means of passage to the dominant estate."

---

[3]     (...continued)
the controversy as to customs affecting lands in the community.

[4]     The text of the court's order relating to the issue of whether a prescriptive easement was established is set forth in Appendix B.

978 P.2d at 84-85 (citations omitted). The Court relied primarily on *McGill v. Wahl*, 839 P.2d 393, 397-98 (Alaska 1992), in this respect, in which the Court held:

> However, in this case it would be inappropriate for us to presume that the Wahls were acting as merely permitted users of the roadway. Such a presumption does not arise where a roadway was not established by the owner of the servient estate for its own use but was for many years the only means of passage to the dominant estate. *Richardson v. Brennan*, 92 Nev. 236, 548 P.2d 1370, 1372 (1976).

Both of these cases involved an allegation of a prescriptive easement by a person whose driveway crossed the property of another person. The Court essentially held that in such cases, hostility is presumed and generally can only be rebutted by an affirmative act by the landowner of the subservient estate. As the Court explained in *McGill*:

> The roadway originally was and continuously had been used as access to the lots behind the McGills' property. The roadway existed and was used by the Nels Wahls before the McGills came to the property. Although other lot owners now use Highway 1 to get to their lots, the use of the roadway has never changed with respect to lot 11. The McGills, having come to land burdened by the roadway, cannot now claim that the users of the roadway were acting merely with their permission. Likewise, the McGills without any affirmative action cannot now claim that they intended to permit the use of the road by the other landowners.

*Id.*

This case is virtually identical to *McDonald* and *McGill*. There is no dispute that Ms. Tauscher and plaintiff crossed lot 28 solely for the purpose of gaining access to their

property. Defendants came to lot 28 well after that use began. And they took no affirmative action to block the access until 2009. Plaintiff's use therefore was hostile.

The superior court went on to state that even if there were no presumption of hostility, the court would conclude that Tauscher's use of the trail was hostile because there was no evidence that the owners of lot 28 did not acquiesce in Tauscher's use of the trail, nor was there evidence that Tauscher, or Shaw, ever acknowledged that their use was subordinate to the owner's title. The court wrote:

> The court would reach the same conclusion even absent the presumption. In determining whether a use is hostile, the court must look to whether the owner of lot 28 gave his or her permission to use the trail or merely acquiesced in that use. In particular, as the Alaska Supreme Court explained in *Tenala, Ltd. v. Fowler*, 921 P.2d 1114, 1120 (Alaska 1996):
>
>> In *Swift v. Kniffen*, 706 P.2d 296, 304 (Alaska 1985), we stated that "[t]he hostility element turns on the distinction between acquiescence and permission," and held that if the true owners merely acquiesce, and do not intend to permit a use, the claimant's use is adverse and hostile. Therefore, we must decide whether the record reveals that Tenala intended to permit the Mayos' use or merely acquiesced in that use. In *Hubbard v. Curtiss*, 684 P.2d 842, we stated that "[t]he key difference between acquiescence by the true owner and possession with the permission of the true owner is that a permissive use requires the acknowledgment by the possessor that he holds in subordination to the owner's title." *Id.* at 848 (citations omitted).
>
> The evidence here supports a finding of acquiescence by clear and convincing evidence. First, and perhaps most

important, there was absolutely no evidence that the original owner of lot 28 had any conversation whatsoever with Ms. Tauscher regarding her right to use the trail as her driveway to her lots. Nor is there any evidence that Ms. Tauscher or plaintiff ever acknowledged to that person that her use "was in subordination to" that owner's title. There accordingly is no evidence to counter the claim by plaintiff and his brother that they always assumed they had the right to cross the property and that no one really cared whether they did so.

The court also found that the use of the trail was notorious, noting that it was undisputed that Tauscher had used the trail as her driveway and had done so openly and obviously. After rejecting Dault's affirmative defense of laches and holding that other landowners did not have to be joined under Alaska Civil Rule 19, the court directed entry of judgment declaring that a prescriptive easement existed on the portion of the trail that crosses lot 28. The court also ordered Dault not to obstruct the easement and required him to remove the obstruction that was already present.

The court recognized some problems inherent in this resolution and encouraged the parties to consider settlement:

> The court feels constrained to note, however, that while plaintiff has thereby won this battle, it is not at all clear that this is the best result long-term for any of the parties. Because the trail crosses defendants' property in a manner that makes it very difficult to develop, plaintiff's use of the trail will create ongoing difficulties with his neighbor. It seems to the court that this is a matter that can and should have been resolved through settlement in a manner that assured plaintiff access and defendants full use of their land. The court encourages the parties to explore settlement in lieu of any further legal proceedings.

## III.   STANDARD OF REVIEW

The question in this case is whether an evidentiary presumption was correctly applied.  This is a question of law.  We review such questions de novo.[5]

## IV.   DISCUSSION

On appeal Dault challenges the superior court's findings concerning notoriety, continuity, and hostility.  In addition, he argues that the court erred in failing to bar Shaw's claim on the grounds of laches, that the claim should have been dismissed for failure to join indispensable parties, and that the location, type, character, and scope of the easement ordered by the court were insufficiently defined.  Because we conclude that the court erred with respect to hostility, we find it unnecessary to consider Dault's other arguments.

**The Superior Court Erred In Holding That The Element Of Hostility Was Satisfied.**

The elements underlying a court-ordered prescriptive easement are similar to the elements for adverse possession of real property, except that adverse possession focuses on possession, which is ordinarily exclusive, whereas prescriptive easements focus on use, which is often non-exclusive.[6]

> To be entitled to a prescriptive easement, a party must prove (1) continuity — that the use of the easement was continuous and uninterrupted; (2) hostility — that the user acted as the owner and not merely one with the permission of the owner; and (3) notoriety — that the use was reasonably visible to the record owner.  A claimant must prove each element by clear

---

[5]   *In re Estate of Fields*, 219 P.3d 995, 1002-03 (Alaska 2009).

[6]   *Tenala, Ltd. v. Fowler*, 921 P.2d 1114, 1119 (Alaska 1996).

and convincing evidence. Finally a claimant must have engaged in the adverse use for at least ten years.[7]

Until amendments made in 2003, adverse possession was governed by two statutory sections. The first, AS 09.10.030, provided:

> No person may bring an action for the recovery of real property, or for the recovery of the possession of it unless commenced within 10 years. No action may be maintained for the recovery unless it appears that the plaintiff, an ancestor, a predecessor, or the grantor of the plaintiff was seized or possessed of the premises in question within 10 years before the commencement of action.

Although in form simply a statute of limitations, this section served as the basis for establishing new title through adverse possession.**8**

The other statutory section, AS 09.45.052, allowed claimants under color of title to establish title after the passage of seven years. Alaska Statute 09.45.052(a), prior to 2003, provided:

> The uninterrupted adverse notorious possession of real property under color and claim of title for seven years or more is conclusively presumed to give title to the property except as against the state or the United States.

Since the use in question here began, according to Shaw, with Tauscher's use in 1988 and was terminated when Dault blocked the trail in 2009, these statutes govern Shaw's claim as to use of the trail until 2003.

The 2003 amendments substantially changed and restricted the law of adverse possession. Alaska Statute 09.10.030(a) and (b) now reads:

---

**7**    *McDonald v. Harris*, 978 P.2d 81, 83 (Alaska 1999) (emphasis and internal citations omitted).

**8**    *Cowan v. Yeisley*, 255 P.3d 966, 973 n.23 (Alaska 2011); *Tenala*, 921 P.2d at 1118.

(a) Except as provided in (b) of this section, a person may not bring an action for the recovery of real property or for the recovery of the possession of it unless the action is commenced within 10 years. An action may not be maintained under this subsection for the recovery unless it appears that the plaintiff, an ancestor, a predecessor, or the grantor of the plaintiff was seized or possessed of the premises in question within 10 years before the commencement of the action.

(b) An action may be brought at any time by a person who was seized or possessed of the real property in question at some time before the commencement of the action or whose grantor or predecessor was seized or possessed of the real property in question at some time before commencement of the action, and whose ownership interest in the real property is recorded under AS 40.17, in order to

(1) quiet title to that real property; or

(2) eject a person from that real property.

Alaska Statute 09.45.052(a) now provides in relevant part:

The uninterrupted adverse notorious possession of real property under color and claim of title for seven years or more, or the uninterrupted adverse notorious possession of real property for 10 years or more because of a good faith but mistaken belief that the real property lies within the boundaries of adjacent real property owned by the adverse claimant, is conclusively presumed to give title to the property except as against the state or the United States.

Under these amendments, adverse possession claims are limited to cases where the claimant either has "a good faith but mistaken belief that the real property lies within the boundaries of adjacent real property owned by the adverse claimant" or is

asserting a claim under color of title.[9]  The ten-year statute of limitations set out in AS 09.10.030(a) does not, because of the language of .030(b), bar a quiet title or ejectment action by a record owner.

If Shaw's claim depended on a period of use after the 2003 effective date of the amended statutes, substantial questions would exist as to whether and how they should be applied to prescriptive easement claims.[10]  But under the view that we take of this case these questions do not arise because even under the pre-2003 statutes, Shaw's claim fails.

Shaw's claim fails because the presumption that the use of a drive across another's property is permissive applies to this case.  The exception relied upon by the superior court applies only where the "roadway was not established by the owner of the servient estate for its own use."[11]  Here it was undisputed that the trail was established by the subdivision developers for their own use in marketing the lots and that the developers allowed lot buyers to use the trail for an indeterminate period.  It would not make sense to presume that the use of a trail as intended by those who owned the land and built the trail was anything other than consensual.  This result is explicitly confirmed by our case law, which establishes that the presumption of permissive use is reversed only when "the driveway existed when [the alleged servient estate owner] first bought

---

[9]     *Cowan*, 255 P.3d at 972-73; *Hansen v. Davis*, 220 P.3d 911, 915 n.7 (Alaska 2009).

[10]     *See* Minutes, House Jud. Comm., Hearing on S.B. 93, 23d Leg., 1st Sess. at 1428 (May 18, 2003) (testimony of Ronald Baird, real estate attorney) (suggesting amendments would extinguish "private prescriptive rights").

[11]     *McGill v. Wahl*, 839 P.2d 393, 397-98 (Alaska 1992); *McDonald*, 978 P.2d at 83.

the property and *there is no indication that her predecessors in title built or used the driveway.*"[12]

---

[12]     *McDonald*, 978 P.2d at 85 (emphasis added).  Our discussion in *Weidner v. State, Department of Transportation & Public Facilities*, 860 P.2d 1205, 1210 (Alaska 1993) casts light on the logic underlying the presumption of permissive use and on the *McGill/McDonald* exception to the presumption.  In *Weidner* the question was whether a road constructed by the State on private property should presumptively be regarded as having been constructed with the permission of the private landowner.  We answered this question in the negative noting that the circumstances — constructing a permanent public road on private land — were inconsistent with permission on the part of the landowner. In reaching this conclusion we discussed *Dillingham Commercial Co. v. City of Dillingham*, 705 P.2d 410, 416-17 (Alaska 1985), which applied the presumption of permissive use in a prescriptive easement context, and *McGill*.  Concerning *Dillingham* we noted that the public's use of land abutting an alley may have been allowed by the owner "to facilitate public access to the owners' businesses . . . ."  *Weidner* at 1210. Comparing these two cases we stated:

> The distinction between *Dillingham* and *McGill* lies in the concepts of "permission" and "claim of right." Permission contemplates the servient landowner's right to revoke that permission and prevent further use of the servient owner's land.  A claim of right, on the other hand, contemplates uninterrupted future use of the property.  In *Dillingham*, *the public's use of the land abutting the alleyway was consistent with the concept of permission*.  If the public merely used the land in order to gain access to the stores along the alleyway, *such use did not contemplate unrestricted future access so much as permission to use the land as an incident to patronizing the stores*.  In *McGill*, on the other hand, the Wahls built and maintained a road across the McGills' land as the *sole* access to the Wahls' property. Since access is essential to the beneficial use of one's land, a road *providing the sole access to a parcel likely contemplates continued use not subject to the permission of another*.  Thus, the maintenance of a *sole* access, without more, gives notice of a claim of right, rather than use subject to permission.

(continued...)

In order to overcome the presumption that the use of the trail was by permission, Shaw was required to provide "proof of a distinct and positive assertion of

---

[12] (...continued)

> This case is closer to *McGill*. In 1968, the State reconstructed the Bay Road. If a deviation was made, the State surely claimed that new portion as part of the land it had a right to use. The dedication of State resources to the construction and maintenance of a public roadway is not the type of land use which one would subject to the permission of a servient landowner. In constructing a road, the government makes a commitment that contemplates continued, unrestricted use of the affected land. In other words, once the State determines a roadway is needed for public access to a certain region, the State surely does not intend such access to be contingent upon the permission of a private landowner. Unlike *Dillingham*, *the interests of the private landowner and the public are not sufficiently aligned for the public's use to be presumptively permissive.* Thus, construction and maintenance of a public roadway is a use that contemplates a claim of right rather than the owner's permission. *Id.* at 1210-11 (emphasis added).

Here, to follow the highlighted portions of the *Weidner* discussion, the new lot owners' uses of the trail were consistent with the concept of permission. If new lot owners used the trail to facilitate development of their lots and for access during a transitional period of subdivision development, such uses did not necessarily contemplate unrestricted future use of the trail but could be pursuant to an accommodation afforded by the subdivision developers to make the lots more attractive for sale. Thus, there was a plausible alignment of interests that was consistent with the concept of permission. Further, the trail was not the sole access to any of the lots, because a platted street that was initially undeveloped abutted every lot. Therefore, one could not say that continued use of the trail without permission was likely contemplated. Finally, since the developers built the trail for their own purposes, its continued use by lot owners did not involve a substantial commitment of resources that would be inconsistent with the eventual cessation of the use of the trail.

a right hostile to the owner."[13] But there was no proof of a distinct and positive assertion of a right on the part of Tauscher against the owners of lot 28. Nor was there such an assertion on the part of Shaw, until this controversy arose in 2009. In fact, there is nothing indicating that Tauscher's use of the trail as the drive to her house was any different than the use of the trail by the Rices, the original owners of lots 33 and 34.

Further, application of the presumption that a use is permissive is consistent with the undisputed facts of this case. The subdivision developers built the trail to facilitate sales and as lots were sold, granted permission to the new lot owners to use it. The duration of the grant of permission from the developers has not been determined.[14] But the crucial fact is that the initial use was by permission. A use that is initially permitted can become adverse only "by proof of a distinct and positive assertion of a right hostile to the owner of the property."[15] Further, the distinct and positive assertion of a hostile right must take the form of conduct that would give the owner of the property notice of hostility and thus of the need to protect the owner's interests.[16] A mere transfer

---

[13]  *McGill*, 839 P.2d at 397 (internal quotation marks omitted).

[14]  Also undetermined is the effect of the right-of-way reservation in favor of the grantor developers contained in most of the initial deeds, but not in the deed for lot 28. Dault contends that the deed language confirms the temporary nature of the easement, since the easement is reserved to the grantors and does not mention their "successors and assigns." Shaw responds that "nothing in the plain language of these deeds refer[s] to a 'temporary' easement." Neither party makes a detailed argument, undoubtedly because the deed to lot 28 contains no such reservation. We express no view on this question.

[15]  *City of Anchorage v. Nesbett*, 530 P.2d 1324, 1328-29 (Alaska 1975) (internal citation omitted).

[16]  *Id.* at 1330 ("If permissive in its inception, then such permissive character being stamped on the use at the outset, will continue of the same nature, and no adverse
(continued...)

of ownership does not suffice to convert a permitted use to a hostile use.[17]  As the Idaho

Supreme Court has noted:

> To hold that permission granted automatically expires
> without some action of adverseness would be to require that
> the permission be regranted by the owner of the servient
> estate each time the dominant estate was transferred.  Such a
> rule would impose too great a burden of inquiry as to
> property ownership upon servient estate holders.[18]

The effect of the presumption of permissive use in this case was that Shaw

had the burden of going forward with evidence to rebut the presumption.[19]  This burden

required Shaw to introduce evidence sufficient to permit a reasonable conclusion that the

use of the portion of the trail crossing lot 28 by the owners of lots 33 and 34 was hostile,

rather than permissive, for a ten-year period.

The trial court appears to have concluded that acquiescence in the use of

the trail by the owners of lot 28 serves as evidence of hostility.  But this conclusion was

erroneous because owner acquiescence is not "a distinct and positive assertion of a right

---

[16]      (...continued)
user can arise until a distinct and positive assertion of a right to the owner, and brought
home to him, can transform a subordinate and friendly holding into one of an opposite
nature . . . ." (quoting *Scheller v. Pierce Cnty.*, 104 P.2d 277 (Wash. 1909))); *Hunter v.
Shields*, 953 P.2d 588, 592 (Idaho 1998) ("Absent unequivocal conduct giving the owner
of the property notice of hostility and adverseness, we will not conclude that a use
initiated with permission has somehow changed to one of hostility." (quoting *Lorang v.
Hunt*, 693 P.2d 448, 450 (Idaho 1984))).

[17]      *City of Anchorage*, 530 P.2d at 1329.

[18]      *Hunter*, 953 P.2d at 592.

[19]      Alaska R. Evid. 301(a).

hostile to the owner."[20] Moreover, the fact that one owner has acquiesced in a use is not at all inconsistent with the possibility that an earlier owner permitted it. The court's use of acquiescence in this case changed the presumption of permission to a presumption of hostility and erroneously placed on Dault the burden of proving consent.[21]

In concluding that the court erred in finding that Shaw has a prescriptive easement to use the portion of the trail crossing lot 28, we are aware that this will mean that Shaw will have to build a driveway on his lots to North Shore Drive. In view of the steepness of the ridge this may entail considerable earthmoving efforts similar to, or perhaps more intensive than, those undertaken by the owners of other developed lots in the subdivision. This burden, however, does not justify imposition of an easement on lot 28. But the superior court on remand may consider the entry of an order that would permit Shaw to use the trail for a short period until he is able to build a driveway on his own property.[22]

---

[20]     *City of Anchorage*, 530 P.2d at 1328-29.

[21]     This is evident from the court's language quoted *supra* on p. 14: "There accordingly is no evidence to counter the claim by plaintiff and his brother that they always assumed they had the right to cross the property and that no one really cared whether they did so."

[22]     The dissent argues that there was a dispute as to whether the developers of the subdivision were initially the owners of all the lots in the subdivision. We disagree. Robert Dobson testified at trial that the developers owned the entire subdivision. This echoed his affidavit submitted in opposition to Shaw's motion for summary judgment and in support of Dault's cross-motion for summary judgment, which in inclusive terms described the developers as the "developer-owners of the subdivision" "who purchased the lots from Helen Clements." James Dault also testified in inclusive terms in his affidavit relating to the same motions that "Helen Clements sold the land to three couples who sold lots through the business known as Totem Realty. The lot owners then asked Gus Scheele to put in the trail." Likewise in his trial brief concerning the issue of

(continued...)

## V. CONCLUSION

For the reasons stated, the judgment of the superior court is REVERSED and this case is REMANDED with instructions to enter judgment in favor of the appellants in accordance with the views expressed in this opinion.

---

[22] (...continued)
consent, Dault asserted without exception or qualification that "the realtor purchasers of the platted subdivision hired a local earth mover to construct a trail. . . ." Shaw did not take issue with any of these assertions and at no point argued that the developers did not have an ownership interest in all the lots when they built the trail. Nor does he do so on appeal. Likewise the trial court never suggested that the subdivision developers who constructed the trail did not have an ownership interest in all the lots over which the trail passed. See the court's decision set out in Appendix B, especially pages 2 and 3 where the trial court refers to the builders of the trail as "the subdivision developer" and "the original developer." Indeed the trial court's understanding of the situation seems well reflected by a question the court asked of Shaw's counsel during final argument after all the evidence was presented. The court referred to "whoever it was who created the subdivision way back when" as the person who "put in a trail that rendered the lots fairly undevelopable if in fact that was going to be the right-of-way."

The dissent also claims that the trial court made an implicit finding that the "realtor-developers did not own Lot 28 when they bulldozed the trail. . . ." But there is nothing in the court's opinion that implies such a finding. The dissent also refers to the trial court's "express finding that there was no evidence the owner of Lot 28 said or did anything with respect to the trail bulldozed across Lot 28." But the finding referred to relates to the absence of any conversation between the owner of lot 28 and Shaw's mother, Alice Tauscher. *See* Appendix B, page 9. Tauscher began to occupy her property in the subdivision in 1988, at least 20 years after the trail was constructed. The absence of any conversation with Tauscher in 1988 says nothing about whether the developers had an ownership interest in Lot 28 when the trail was constructed.

WINFREE, Justice, with whom STOWERS, Justice, joins, dissenting.

In my view the trial court correctly applied our existing case law, made findings of fact not clearly erroneous, and did not err by ultimately deciding that Edward Shaw had a perfected prescriptive easement across the property owned by James Dault and Shala Dobson (Dault) in the North Shore Subdivision.

The fundamental issue in this case is whether clear and convincing evidence demonstrates that Shaw and his predecessors' use of the trail across Dault and his predecessors' property was sufficiently "hostile" to support perfection of a prescriptive easement, *i.e.*, whether Lot 28's series of owners acquiesced to, but did not permit, use of the trail across the lot. The trial court found such clear and convincing evidence, first by employing a presumption of hostility based on *McDonald v. Harris*,[1] and alternatively by ignoring that presumption and using the normal hostility standard.[2]

The court today holds that the trial court erred in finding that the hostility requirement was met under either approach because:

> Here it was undisputed that the trail was established by the subdivision developers for their own use in marketing the lots and that the developers allowed lot buyers to use the trail for an indeterminate period. It would not make sense to presume

---

[1]    978 P.2d 81, 84-85 (Alaska 1999) (describing general presumption of permission for adverse use of land and exception where "a roadway was not established by the owner of the servient estate for its own use but was for many years the only means of passage to the dominant estate" (citing and quoting *McGill v. Wahl*, 839 P.2d 393, 397-98 (Alaska 1992))). We never have expressed the reverse presumption stated by the trial court, but the court today does not question it.

[2]    *Id*. at 84 ("The hostility requirement . . . is 'determined by application of an *objective* test which simply asks whether the possessor acted toward the land as if he owned it, without the permission of one with legal authority to give possession.' " (emphasis in original) (quoting *Nome 2000 v. Fagerstrom*, 799 P.2d 304, 310 (Alaska 1990))).

-25-                                                                6847

that the use of a trail as intended by those who owned the land and built the trail was anything other than consensual.[3]

But if all that this statement implies really were undisputed, the case would not have survived summary judgment. Acting as its own fact-finder, the court reaches a view of the record not shared by the parties or the trial court — that it is undisputed that the realtor-developers were among Dault's predecessors in title to Lot 28.

According to the 1966 recorded plat, the original owner and subdivider of the property resulting in the North Shore Subdivision was Helen P. Clements. The court acknowledges that Clements recorded the subdivision plat, and then states that "other evidence established" that John and Ina Boss and Louis and Mary Odsather were the subdivision developers.[4] I have no quarrel with this latter assertion — evidence in the record demonstrates that the Bosses and Odsathers were connected to a realty company and they purchased subdivision lots from Clements as a development project; they rightfully are described as the subdivision developers, but they were not the original subdivider. This is an important distinction when considering who was in the chain of title to Dault's Lot 28. As the original subdivider, Clements clearly was in that chain of title. But the realtor-developers were in that chain of title only if they actually acquired Lot 28 and then conveyed it to a Dault predecessor-in-title, and not merely because the court labels them "the subdivision developers."

Dault's trial brief stated that Clements had created the subdivision and that "the realtor purchasers of the platted subdivision hired a local earth mover to construct [the] trail." At trial Dault introduced a number of deeds and a real estate contract into evidence, covering subdivision Lots 26, 29, 30, 31, 32, 33, and 35, all reflecting

---

3    Op. 18.

4    Op. 4-5.

conveyances by the realtor-developers (beginning in 1967); these documents also reflect the realtor-developers' specific reservation of a 20-foot-wide right-of-way easement on the north half of the lots, consistent with the trail location. Dault also introduced into evidence a 2005 deed covering Lot 27, reflecting a sales transaction by the then-current owners but referencing a 20-foot-wide right-of-way easement on the north half of the lot that had been reserved in an earlier deed by the realtor-developers.

Conspicuous by its absence from the record is a deed showing or suggesting that the realtor-developers ever owned Dault's Lot 28. The only deed for Lot 28 in the record is the deed by which Dault came into title. That deed is notable for its lack of reference to a 20-foot-wide right-of-way easement reserved by the realtor-developers. Dault testified at trial that to his knowledge there had never been such a reserved easement on Lot 28, and he identified his predecessors in title as first the Habersetzers and previous to them George Stepanov. He believed Stepanov got the property "back in '65."[5]

---

[5]    The State of Alaska, Department of Natural Resources, maintains an on-line data bank of recorded real property transactions, and the recorded transaction documents are readily accessible public records subject to judicial notice. More than a century ago, the United States Supreme Court held that, "[w]hile it is ordinarily true that this court takes notice of only such facts as are found by the court below, it may take notice of matters of common observation, of statutes, records, or public documents which were not called to its attention, or other similar matters of judicial cognizance." *N.Y. Indians v. United States*, 170 U.S. 1, 32 (1898). A half-century later, the United States Court of Appeals for the Tenth Circuit echoed this principle when it held, "[w]hether an appellate court will for the first time take judicial notice of a judicially notable fact rests largely in its own discretion. There are numerous cases in which appellate courts have reversed the lower courts by taking judicial notice for the first time on appeal of a fact which was not called to the attention of the trial court." *Mills v. Denver Tramway Corp.*, 155 F.2d 808, 812 (10th Cir. 1946). And the United States Court of Appeals for the Sixth Circuit has held that "it [is not] necessary that the Court be requested to take judicial notice of

(continued...)

The trial court's finding of acquiescence rested on this factual record:

First, and perhaps most important, there was absolutely no evidence that the original owner of lot 28 had any conversation whatsoever with [Shaw's mother (his immediate predecessor in title)] regarding her right to use the trail as her driveway to her lots. Nor is there any evidence that [Shaw's mother or Shaw] ever acknowledged to that person that her use "was in subordination to" that owner's title. There accordingly is no evidence to counter the claim by [Shaw] and his brother that they always assumed they had the right to cross the property and that no one really cared whether they did so.

---

(...continued)

a fact before it is authorized to do so. The Court may take judicial notice sua sponte." *United States v. Harris*, 331 F.2d 600, 601 (6th Cir. 1964) (citing *Weaver v. United States*, 298 F.2d 496, 498 (5th Cir. 1962)).

Palmer Recording District records show the following series of conveyances recorded for Lot 28: on January 22, 1974 at Book 79, Page 294, a January 1974 Executor's Deed from the Estate of Helen P. Clements to George A. and Lora Stepanov, as tenants by the entirety; on August 2, 2004 as Document 2004-021192-0, a Corrected Clerk's Deed conveying Lora Stepanov's interest to George A. Stepanov; on August 2, 2004 as Document 2004-021193-0, a Statutory Warranty Deed from George Stepanov to Douglas L. and Donna M. Habersetzer, as tenants by the entirety; and on December 29, 2006 as Document 2006-036772-0, a Warranty Deed from Douglas L. and Donna M. Habersetzer to James M. Dault and Shala Dobson, as tenants in common. (Document copies are attached in order as Appendix C to today's decision.) Due to the poor scanning quality of older documents for the Palmer Recording District, I was unable to locate recorded documents for Clements's transaction(s) with the realtor-developers or for Clements's earlier transaction with Stepanov.

It is sufficient for this dissent to take judicial notice of these recorded deeds for the limited purposes of supporting Dault's own testimony about the chain of title for his Lot 28, which the court fails even to acknowledge, and contradicting the court's factual determination the realtor-developers indisputably owned Lot 28 when they bulldozed the trail across it.

The trial court also responded as follows to Dault's arguments about how the community generally understood the trail's nature:

> There is a further and more substantial difficulty with [Daults'] analysis. The evidence regarding what was done on [other] properties pertains only to those properties — it speaks nothing about what the owner of lot 28 had in mind.

As the party who would have benefitted from demonstrating that the realtor-developers owned Lot 28 when they bulldozed the trail across it, Dault had the burden of producing that evidence; he knew the importance of the information, and he obviously researched his chain of title. Robert Dobson's testimony about his personal 1968 understanding that the realtor-developers owned the subdivision is not much support for the court's proposition that it is undisputed that the realtor-developers owned Lot 28 when they bulldozed the trail across it. If the court's proposition were true, there would have been no need for Dault to press his argument about an alleged community understanding that use of the trail was authorized but temporary. Dault pressed that argument because he could not prove that a predecessor in title played any part in bulldozing the trail across Lot 28 and he needed to cast doubt on Shaw's evidence that Shaw's predecessors used the trail across Lot 28 as if it were their own.

There is no place in the trial court record where either Dault or Shaw asserted that the realtor-developers owned Lot 28 when they bulldozed the trail across it. There is no place in the trial court record where either Dault or Shaw asserted that the realtor-developers had the consent of Lot 28's owner when they bulldozed the trail. There is no place in the appellate briefing before us where either Dault or Shaw makes these assertions. Yet the court today finds it undisputed that the realtor-developers owned Lot 28 when they bulldozed the trail.

It is undisputed that Clements was the one and only subdivider. It is undisputed that Clements sold lots to the realtor-developers, although we do not know

when; and that they bulldozed the trail across a number of lots in the subdivision, including Lot 28, although we do not know when. It is undisputed that for lots the realtor-developers purchased, bulldozed the trail over, and then sold, they reserved a 20-foot-wide right-of-way easement along the bulldozed trail. It is undisputed that no such easement burdens Lot 28.

But it is not undisputed that an owner of Lot 28 played a part in bulldozing the trail and therefore gave permission for others to use it. To the contrary, given Dault's own testimony and the lack of a reserved easement on Lot 28, evidence in the record supports both the trial court's implicit finding that the realtor-developers did not own Lot 28 when they bulldozed the trail and its express finding that there was no evidence the owner of Lot 28 said or did anything with respect to the trail bulldozed across Lot 28. The trial court weighed the evidence actually presented and obviously concluded that the realtor-developers did not have ownership of Lot 28 when they bulldozed the trail; otherwise Dault would have prevailed at trial. The court today wrongfully reweighs the evidence and concludes Dobson's understanding, that when he bought his lot in 1968 the realtor-developers owned the subdivision, not only outweighs Dault's own testimony about the specific chain of title to Lot 28, but is so dispositive that it is indisputable proof that the realtor-developers owned Lot 28 when they bulldozed the trail.

Ownership of Lot 28 when the trail was bulldozed was critical to the issue of permission versus acquiescence, and it was not an undisputed fact simply forgotten or overlooked by the parties or the trial court. The trial court heard the evidence and made a finding of fact that should be reviewed only for clear error. This court does a disservice to the parties and the trial court by abandoning its normal course of appellate review and becoming its own fact-finder, here finding as a matter of "undisputed" fact, despite the evidence and the parties' litigation strategies to the contrary, that the realtor-

developers owned Lot 28 when they bulldozed the trail across it. There is no such undisputed fact, only the court's mistaken assumption of a fact not in evidence.

I dissent.



DEFENDANT
EXHIBIT NO. A
ADMITTED ☐
3PA-10-1537 CI

Exhibit ___A___

Pg ___1___ of ___1___

199

APPENDIX A - Page 1 of 1          **6847**

# IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

# THIRD JUDICIAL DISTRICT AT PALMER

EDWARD SHAW,            )
                                      )
             Plaintiff,        )
                                      )
v.                                )
                                      )
JAMES DAULT and SHALA   )
DOBSON,                    )
                                      )
             Defendant.       )
_____ )        Case No. 3PA-10-1559 CI

## ORDER

Trial was held in this case on March 7-9 and 16, 2011. All parties were present, represented by counsel. Having heard the evidence, the court finds that plaintiff has demonstrated by clear and convincing evidence that he has a prescriptive easement to the driveway crossing defendants' land to his property. The court further finds that plaintiff's claim should not be dismissed for failure to join indispensable parties or for laches.

### Factual Background

Plaintiff Edward Shaw owns lots 33 and 34 in the North Shore Subdivision. Defendants James Dault and Shala Dobson own lot 28 in that subdivision. Mr. Shaw accesses his property by means of what he terms a "driveway" and what defendants term a "trail" that crosses defendants' property. He claims that he has a prescriptive easement granting him a property right in the driveway; he seeks declaratory relief to that effect, as well as an injunction ordering defendants to remove the obstruction they have placed on the access.

North Shore Subdivision is located on the north shore of Blodgett Lake. It basically consists of a ridge with very steep sides that go down to the lake to the south and a somewhat swampy area to the north. North Shore Drive was originally platted to go through the swampy area below the ridge – it was not very drivable when the subdivision was first offered for sale in the 1960's, and little maintenance was done on the road for many years.

The subdivision developer bulldozed a trail along the ridge itself so that prospective buyers could gain access to the property. That trail was used by persons who bought lots in the subdivision. Since the trail went through each lot, rather than along one side, the people who bought lots generally moved the trail to the side so they could build a house. Several landowners in fact filled in the area platted as North Shore Drive, effectively upgrading the road and making it more passable. These landowners, including Gordon Benedict, who bought lot 40, used the trail for access until the road was redone in a way that made it usable. The use of the trail necessarily meant that people in the further lots were crossing the lots of those closer to the beginning of the subdivision.

The court heard a considerable amount of credible evidence that the owners of lots 22 through 26 took a lot of surface gravel off the ridge to flatten it, thereby effectively eliminating the trail. That gravel was placed in the right of way platted as North Shore Drive. As best the court can determine, North Shore Drive was relatively passable sometime in the mid-1990's. There apparently was no objection from anyone who used the trail when these landowners eliminated the trail and required those passing through to drive on North Shore Drive.

Alice Tauscher, plaintiff's mother, bought lots 33 and 34 in 1988. There was a building on those lots, which Ms. Tauscher upgraded to some extent. While the parties greatly dispute the extent to which she and plaintiff lived there over the next 20 years,

there is no dispute that she accessed these lots through the trail that had been bulldozed by the original developer, as modified by the landowners in the lots over which she crossed to get to her property.

As noted above, the trail effectively was eliminated up through lot 26. The trail did remain on lots 27-35 – it took off up the hill on lot 27, and then crossed the other lots, ending around lot 35 and passing directly in front of the Kreins' residence on lot 32 and Ms. Tauscher's residence on lots 33 and 34. Some work was done in 1997 to flatten lot 27, and the trail apparently was moved somewhat as a result. In addition, at approximately the same time, a parking lot was constructed next to the trail on lot 28. But the basic contours of the trail remained as they had been since the time the trail was built.

Ms. Dobson's father bought lot 23 in 1968 and built a house there that his family mostly used in the summers. Ms. Dobson and her husband, Mr. Dault, spent time with the family there. They purchased lot 35 in 1997, planning to build a house there. At some point, they decided to bring in heavy equipment to flatten the ridge, so they could install a septic. They went to speak with Ms. Tauscher about these plans, and had what they termed a cordial discussion with her. But after they started construction, Mr. Shaw told them not to cross his property. They honored that request, so they put in a driveway and cleared the top of the ridge.

Defendants purchased lot 28 in 2006 with the intention of putting in a ranch house there. They did not think that Ms. Tauscher would object to their plan. In 2009, they built a driveway to that lot, as well as a shed that partially blocked the trail.

Ms. Tauscher died in 2007, leaving the house to plaintiff. Plaintiff was incarcerated at the time. He and his brother, Michael Shaw, decided to put the property up for sale. Michae1 went to the property in July 2009 for this purpose and found the driveway blocked. Hearing chainsaws up the driveway, he walked up and found Mr.

Dault clearing the land for his driveway. The two men had a somewhat acrimonious discussion, during which, according to Michael Shaw, defendants agreed to talk to the Borough about their plans. Michael Shaw and Mr. Dault spoke again a few weeks later; Mr. Dault said he had been too busy to speak with the Borough.

Plaintiff sent a letter to defendants in April 2010 demanding that they remove the obstruction. When defendants did not do so, plaintiff filed this action on May 12, 2010.

<u>Analysis</u>

. . . .

<u>Prescriptive easement</u>

The central issue in this case is whether plaintiff has demonstrated that he is entitled to a prescriptive easement to access his property using what he terms the driveway across lot 28.

> To be entitled to a prescriptive easement, a party must prove (1) continuity–that the use of the easement was continuous and uninterrupted; (2) hostility–that the user acted as the owner and not merely one with the permission of the owner; and (3) notoriety–that the use was reasonably visible to the record owner. A claimant must prove each element by clear and convincing evidence. Finally, a claimant must have engaged in the adverse use for at least ten years.

<u>McDonald</u>, 978 P.2d at 83 (citations deleted). The court will address each criterion in turn. The court will then evaluate defendants' related claim that plaintiff has failed adequately to define the scope of the easement.

<u>Continuity</u>

The Alaska Supreme Court stated in <u>McDonald</u> that in determining whether a person has made continuous and uninterrupted use of an easement, the court may look to "whether the adverse possessor has used and enjoyed the land as 'an average owner of similar property would use and enjoy it.' " <u>Id.</u> (citation omitted). Plaintiff has

provided clear and convincing evidence that he and his mother used the easement in the same manner an average owner of a similarly located parcel, and that he did so for more than ten years.

Plaintiff presented highly credible testimony from himself, his brother, his ex-wife, and a girlfriend who lived with him at the house that he and his mother continuously used the driveway to get to the house since his mother purchased the property in 1988. In particular, plaintiff and his brother credibly testified that the house was her primary place of residence until she passed away in 2007, with the exception of a brief period of time when plaintiff and his wife lived there. Plaintiff's ex-wife and girlfriend corroborated that testimony, although the girlfriend was somewhat confused as to the exact years involved after 2004. That testimony was further corroborated by Mr. Benedict and his son, both of whom stated that they saw plaintiff's mother going to the house, that they plowed the driveway at times, that they saw tire tracks going up there in the snow, and that they saw vehicles stuck in the ditch along the driveway.

Defendants contested this testimony by presenting evidence from other people with dwellings in the subdivision that they rarely saw plaintiff or his mother at the house. The problem with this testimony is two-fold. First, plaintiff was in and out of jail throughout these years, and his mother spent much of that time working a two-week on/two-week off schedule. Second, and more important, with the exception of Mr. Benedict, all of these individuals did not live in the subdivision full-time – they primarily were there during the summer and occasionally during the winter. The court also notes that with the exception of the Kreins, all of these lot owners lived along Lake Shore Drive, and so would only have seen plaintiff and/or his mother driving by on that road, rather than across their property. It therefore is not surprising that the other lot owners did not see plaintiff or his mother very much.

Defendants also suggest that any use of the driveway could not have been continuous in view of plaintiff's incarceration and the fact that Ms. Tauscher was on the Slope half of each month. They also note that the driveway was unplowed for what they believe to be significant periods of time. But "to establish abandonment the period of non-use must indicate that the adverse user had ceased his use and claim." Swift v. Kniffen, 706 P.2d 296, 304 (Alaska 1985). There is no such showing here – after all, the average lot owner who works on the Slope will only be present at the lot when not working; the same is true for a person who has had difficulties with the law.

Nor does the fact that the road was unplowed at times prove a lack of use. The Alaska Supreme Court addressed this point directly in Swift:

> The fact that the road was sometimes unplowed and impassable for weeks at a time does not signify either abandonment or interrupted use. First, failure to plow and use a road for a few weeks in winter in Fairbanks does not demonstrate that the Swifts no longer intended to use the road as an alternative route to their property. Second, interruption of possession or use must be caused by the record owner or third parties. The Swifts' use of the roadway was not interrupted until the fall of 1981, when the Kniffens physically blocked the roadway. Prior to that time, the Kniffens apparently posted signs warning against trespassing and ran an advertisement. These acts, however, were not sufficient by themselves to interrupt the Swifts' adverse use. The roadway's closure due to snowfall cannot be considered an interruption because it was not caused by the Kniffens or Fairhill.

Id. (citations omitted). The same logic applies here.

Defendants contend finally that the alterations made to the trail on lots 27 and 28 interrupted the continuous use of the trail as access to lots 33 and 34. The fact that these changes were made does not, of itself, mean that plaintiff's use was not continuous.

Hanson v. Davis, 220 P.3d 911, 916 (Alaska 2009) ("Indeed, so long as the use is consistent with the rights granted in the easement, the owner of a servient estate may make substantial use of the easement area."). Rather, those changes must somehow affect the use of the trail for its intended purpose of access to plaintiff's lots.

The evidence at trial was directly to the contrary. The change to the trail on lot 27 was rather minor and did not impede access to plaintiff's lot. The modification on lot 28 consisted of a parking lot, which again did not impede access. And since access was not blocked, the adverse use of the trail by plaintiff and his mother was not interrupted. Swift, 706 P.2d at 304.

For these reasons, plaintiff has proven by clear and convincing evidence that he and his mother used the trail as their driveway continuously from 1988 through at least 2007, a period of more than 10 years.[2] Plaintiff therefore has met the first criterion to demonstrate a prescriptive easement.

Hostility

The Alaska Supreme Court set forth the applicable analysis relating to hostility in McDonald:

> The hostility requirement, however, is "determined by application of an objective test which simply asks whether the possessor acted toward the land as if he owned it, without the permission of one with legal authority to give possession." Still, we will presume that the use of land by an alleged easement holder was permissive unless a claimant proves "a distinct and positive assertion of a right hostile to

---

[2]    Defendants do not directly assert that the use was abandoned once Ms. Tauscher passed away in 2007, nor could they do so. Plaintiff was incarcerated for part of the time after she dies, and he and his brother decided to put the property up for sale. This latter action entails that plaintiff never abandoned or had any intent to abandon his use of the driveway.

the owner." But this presumption does not arise if "a roadway was not established by the owner of the servient estate for its own use but was for many years the only means of passage to the dominant estate."

978 P.2d at 84-85 (citations omitted). The Court relied primarily on McGill v. Wahl, 839 P.2d 393, 397-98 (Alaska 1992), in this respect, in which the Court held:

> However, in this case it would be inappropriate for us to presume that the Wahls were acting as merely permitted users of the roadway. Such a presumption does not arise where a roadway was not established by the owner of the servient estate for its own use but was for many years the only means of passage to the dominant estate. Richardson v. Brennan, 92 Nev. 236, 548 P.2d 1370, 1372 (1976).

Both of these cases involved an allegation of a prescriptive easement by a person whose driveway crossed the property of another person. The Court essentially held that in such cases, hostility is presumed and generally can only be rebutted by an affirmative act by the landowner of the subservient estate. As the Court explained in McGill:

> The roadway originally was and continuously has been used as access to the lots behind the McGills' property. The roadway existed and was used by the Nels Wahls before the McGills came to the property. Although other lot owners now use Highway 1 to get to their lots, the use of the roadway has never changed with respect to lot 11. The McGills, having come to land burdened by the roadway, cannot now claim that the users of the roadway were acting merely with their permission. Likewise, the McGills without any affirmative action cannot now claim that they intended to permit the use of the road by the other landowners.

Id.

This case is virtually identical to McDonald and McGill. There is no dispute that Ms. Tauscher and plaintiff crossed lot 28 solely for the purpose of gaining access to their

property. Defendants came to lot 28 well after that use began. And they took no affirmative action to block the access until 2009. Plaintiff's use therefore was hostile.

The court would reach the same conclusion even absent the presumption. In determining whether a use is hostile, the court must look to whether the owner of lot 28 gave his or her permission to use the trail or merely acquiesced in that use. In particular, as the Alaska Supreme Court explained in Tenala, Ltd v. Fowler, 921 P.2d 1114, 1120 (Alaska 1996):

> In Swift v. Kniffen, 706 P.2d 296, 304 (Alaska 1985), we stated that "[t]he hostility element turns on the distinction between acquiescence and permission," and held that if the true owners merely acquiesce, and do not intend to permit a use, the claimant's use is adverse and hostile. Therefore, we must decide whether the record reveals that Tenala intended to permit the Mayos' use or merely acquiesced in that use. In Hubbard v. Curtiss, 684 P.2d 842, we stated that "[t]he key difference between acquiescence by the true owner and possession with the permission of the true owner is that a permissive use requires the acknowledgment by the possessor that he holds in subordination to the owner's title." Id. at 848 (citations omitted).

The evidence here supports a finding of acquiescence by clear and convincing evidence. First, and perhaps most important, there was absolutely no evidence that the original owner of lot 28 had any conversation whatsoever with Ms. Tauscher regarding her right to use the trail as her driveway to her lots. Nor is there any evidence that Ms. Tauscher or plaintiff ever acknowledged to that person that her use "was in subordination to" that owner's title. There accordingly is no evidence to counter the claim by plaintiff and his brother that they always assumed they had the right to cross the property and that no one really cared whether they did so.

Defendants argue that the pattern of activity in the subdivision indicates that everyone there understood that any use of the trail was by consent of the landowner. According to defendants, the practice there was that the trail would only be used until the property was developed, at which time the landowner was entitled to remove the trail with the expectation that he or she would put in his or her own driveway. Defendants assert that this expectation entails that any use of the trail was at the sole discretion and permission of each landowner.

The evidence at trial leads to a different conclusion. There is no question that the trail cut across the lots in a manner that rendered them undevelopable were the trail to remain where it was. But the properties were developed in a manner such that access to the other lots was guaranteed to those other lot owners. In particular, each person moved gravel from their property and filled in North Shore Drive, thereby enabling other people to drive past the lot and gain access. This indicates that to the extent there was an expectation in the community, the implicit understanding was the access would <u>not</u> be precluded, it would just be changed. The fact that these other properties were developed in a manner that destroyed the trail therefore does not entail that use of the trail was permissive.

There is a further and more substantial difficulty with defendants' analysis. The evidence regarding what was done on these properties pertains only to those properties – it speaks nothing about what the owner of lot 28 had in mind. And at most, that evidence indicates only that those landowners were interrupting a use, not that they intended only to permit the use. As such, what was done on these other lots has relatively little bearing on the use plaintiff and his mother made on lot 28.

Defendants point finally to what they term three admissions by Ms. Tauscher and plaintiff that her use was permissive. According to Mr. Dault, the first occurred during a conversation he had with Ms. Tauscher about his plans to level lot 35 and put in a

driveway and a septic. Mr. Dault testified on direct that they had a pleasant conversation for about 10-15 minutes on this topic, during which Ms. Tauscher expressed some concern about having to put in her own driveway and acknowledged that anyone could block her access to her home. The court did not find this testimony credible for two reasons. First, Mr. Dault admitted on cross-examination that in his deposition, he stated that he never "broached" the topic of a driveway at all; his efforts to explain this discrepancy were not convincing. Second, Michael Shaw testified credibly that his mother made it very clear that she did not like Mr. Dault, due to that very conversation, and that he had never heard his mother say anything about putting in a driveway or about some community understanding as to the use of the trail. Taken together, these considerations lead the court to conclude that the topic of access was not discussed when Mr. Dault met with Ms. Tauscher, much less that she conceded that her use was permissive.

The second apparent admission by Ms. Tauscher was during a conversation with Carol Krein, who owned a cabin on lot 32. Ms. Krein testified that she told Ms. Tauscher that she was thinking about expanding her house and putting in a septic, which would mean that she would have to block the trail leading to Ms. Tauscher's house. According to Ms. Krein, Ms. Tauscher stated that she was "fine with that." Ms. Krein admitted on cross-examination, however, that her affidavit did not use the words "fine with that." Having heard the testimony and reviewed the affidavit, the court concludes that Ms. Tauscher did not voice any objection to Ms. Krein's plans. But this does not mean that Ms. Tauscher thereby made some binding admission that she was not entitled to use the trail as her driveway. These two women were neighbors. Ms. Krein testified that her plans were very vague, and there is no reason not to conclude that Ms. Krein made that point to Ms. Tauscher. Under these circumstances, there was no reason for Ms. Tauscher to get in a fight with her neighbor on the basis of a general statement that

perhaps Ms. Krein would have to block the driveway. The court also notes that given the description given of Ms. Tauscher by all the witnesses it is unlikely that she was well versed in the law of prescriptive easements.

The final admission upon which defendants rely is a refusal by plaintiff and his wife to allow Mr. Dault to cross their property to do work on lot 35. Defendants contend that this indicates that even plaintiff viewed the trail as their property and not subject to an easement by those seeking access to a further lot. But defendants read too much into this incident. As noted above, Ms. Tauscher was annoyed at Mr. Dault, a feeling shared by plaintiff. Plaintiff's action therefore was not an admission so much as an effort to keep defendants away. The court doubts very much that the issue of some prescriptive right was going through anyone's mind at the time of that particular dispute. The court also notes that defendants had only recently purchased lot 35, and so would have had some difficulty making a viable claim of access across any of the other lots under a prescriptive easement theory.

Notoriety

In order to demonstrate that a use is notorious, "the adverse user need not demonstrate that the record owner had actual knowledge of the adverse party's presence. The adverse user must show only that a duly alert owner would have known of the adverse presence." McDonald, 978 P.2d at 85 (footnotes deleted.) Plaintiff has met his burden in both respects here. No one denied that Ms. Tauscher and plaintiff used the trail as their driveway. Indeed, there was ample testimony that both individuals had been seen using the driveway on many occasions. In addition, there were tire tracks and footprints in the snow leading up to the house, and vehicles were seen stuck in the ditch at the bottom. All of these factors indicate both that the owner of lot 28 had actual knowledge of the presence of Ms. Tauscher and plaintiff and that a duly alert owner

would have known of their presence.  Plaintiff therefore has demonstrated by clear and convincing evidence that his and his mother's use of the driveway was notorious.

Scope of the easement

Defendants assert that plaintiff did not present any evidence as to the scope of the easement, both with respect to the actual size of the easement and to allowed uses of the easement. There was, however, extensive evidence that the portion of the trail that was used as plaintiff's driveway was readily apparent on the ground, which means that both defendants and any user of the easement are on notice as to what portion of lot 28 is covered by the easement.  With respect to use, the easement is claimed as a driveway, which reasonably entails use for access to the property by the lots' owner and guests, as well as reasonable maintenance so that the driveway can continue to be used as a driveway.  It is unclear to the court just what more is required, given that the trail has been used as a driveway for many years and everyone in the area seems to know full well just what the trail is and how it has been used.

. . . .

Relief

Plaintiff requests a declaratory judgment that he is entitled to a prescriptive easement for the portion of the trail that has been used as his driveway.  Plaintiff also requests both an injunction directing defendants not to obstruct the easement and an order directing them to remove any obstructions. Since plaintiff has demonstrated by clear and convincing evidence that he has a prescriptive easement consisting of that portion of the trail he has used for his driveway across lot 28, he is entitled to the relief he has requested.

The court feels constrained to note, however, that while plaintiff has thereby won this battle, it is not at all clear that this is the best result long-term for any of the parties. Because the trail crosses defendants' property in a manner that makes it very difficult to

develop, plaintiff's use of the trail will create ongoing difficulties with his neighbor. It seems to the court that this is a matter that can and should have been resolved through settlement in a manner that assured plaintiff access and defendants full use of their land. The court encourages the parties to explore settlement in lieu of any further legal proceedings.

<u>Conclusion</u>

For the foregoing reasons, it is ORDERED that:

1.      Plaintiff has a prescriptive easement consisting of that portion of the trail crossing lot 28 that he has used as his driveway to access lots 33 and 34.

2.      Defendants may not obstruct plaintiff's easement in any manner.

3.      Defendants shall remove any obstruction to the easement within 60 days of the date of distribution of this order.

Dated at Palmer, Alaska this 25th day of April, 2011.


_____/s/_____

ERIC SMITH
SUPERIOR COURT JUDGE

AP 2455

## EXECUTOR'S DEED

The Grantor, PAUL F. ROBISON, Executor of the Estate of Helen P. Clements, for and in consideration of the sum of Ten Dollars ($10.00) and other valuable considerations to him paid, GRANTS, CONVEYS and WARRANTS to GEORGE A. STEPANOV and LORA STEPANOV, husband and wife, Grantees, as TENANTS BY THE ENTIRETY, with right of survivorship, and to the heirs and assigns of the survivor, forever, all the estate, right and interest of the above-named decedent at the time of her death, . . . in the following described real property situated in the Palmer Recording District, State of Alaska, more particularly described as follows, to-wit:

PARCEL NO. 1: Southeast one-quarter of the Northwest one-quarter and Government Lots 1, 2 and 4, excepting the following: Beginning at the Southwest corner of Lot 4, thence North along the West boundary of Lot 4, a distance of 275 feet; thence Easterly, parallel with the North boundary of said Lot 4, 175 feet; thence Southerly, parallel with the West boundary of said lot, 200 feet; more or less, to the meander of Lake Blodgett; thence Westerly, along the meander of Lake Blodgett, 185 feet, more or less, to the point of beginning; all being located in Section 8, Township 17 North, Range 2 West, Seward Meridian, Alaska.

EXCEPT: NORTH SHORE SUBDIVISION NO. 1, UNIT NO. 2, according to Plat 66-33, in the Palmer Recording District, Third District, State of Alaska.

PARCEL NO. 2: Lot 28, NORTH SHORE SUBDIVISION NO. 1, UNIT No. 2, according to Plat 66-33, in the Palmer Recording District, Third District, State of Alaska

Subject to the reservations, restrictions and easements contained in patent, or otherwise of record, including oil and gas rights heretofore reserved and conveyed.

All containing 100 acres more or less, which Grantee accepts without survey or representation as to size of parcels.

DATED this 11 day of January, 1974.

Paul F. Robison, Executor of
the Estate of Helen P. Clements

STATE OF ALASKA )
THIRD DISTRICT ) ss.

THIS IS TO CERTIFY that on this 11 day of January, 1974, before me, the undersigned Notary Public duly commissioned and sworn, personally appeared PAUL F. ROBISON, known to me and to me known to be Executor of the Estate of Helen P. Clements; and he acknowledged to me that he signed the foregoing as such Executor, for the uses and purposes therein set forth.
WITNESS my hand and official seal.

Notary Public
My Commission expires 4/21/76

74- 000357
3.00

RECORDED-FILED
PALMER REC.
DISTRICT

Jan 22 9 56 AM '74
VALLEY ABSTRACT AND TITLE CO.
REQUESTED BY_____ BOX 768
ADDRESS_____ PALMER, ALASKA 99645

Rec 58532 9

PAUL F. ROBISON
KENNETH MCCASKEY
JOHN R. STRACHAN
ANDREW E. HOGE
MARVIN S. FRANKEL
PETER A. LEKISCH
LEROY J. BARKER
W. W. CARDWELL, III
DAVID W. MARQUEZ
821 WEST SIXTH AVENUE
ANCHORAGE, ALASKA
279-7481

2004-021192-0

Recording Dist: 311 - Palmer
8/2/2004 11:34 AM Pages: 1 of 2

A
L
A
S
K
A

SUPERIOR COURT FOR THE STATE OF ALASKA
THIRD JUDICIAL DISTRICT AT ANCHORAGE

MS-61893

GEORGE A. STEPANOV,

        Plaintiff,

    vs.

LORA STEPANOV,

        Defendant.

Case No. 3AN-02-11733              CI

CORRECTED CLERK'S DEED

By order of the Superior Court, the Clerk of the Trial Court's does hereby

convey to GEORGE A. STEPANOV, in fee simple, free and clear of any claim

by LORA STEPANOV, the following real property:

Parcel 1:

The Southeast one-quarter of the Northwest one-quarter (SE1/4 NW1/4) and
Government Lots 1, 2 and 4, EXCEPTING THE FOLLOWING:

Beginning at the Southwest corner of Lot Four (4); thence North along the West
boundary of Lot Four (4), a distance of 275 feet; thence Easterly, parallel with
the North boundary of said Lot Four (4), 175 feet; thence Southerly, parallel with
the West boundary of said Lot Four (4), 200 feet, more or less, to the meander
of Lake Blodgett; thence Westerly along the meander of Lake Blodgett, 185
feet, more or less, to the POINT OF BEGINNING; all being located in Section 8,
Township 17 North, Range 2 West, Seward Meridian, Alaska,

EXCEPT

NORTH SHORE SUBDIVISION NO. 1, UNIT NO. 2, according to Plat No. 66-
33, located in the Palmer Recording District, Third Judicial District, State of



Alaska.

Parcel II:

Lot Twenty-eight (28), UNIT NO. 2, NORTH SHORE SUBDIVISION NO. 1, according to Plat No. 66-33, of Section 8, Township 17 North, Range 2 West, Seward Meridian, located in the Palmer Recording District, Third Judicial District, State of Alaska.

DATED this _9th_ day of ~~June~~ July, 2004 at Anchorage, Alaska.

*Brenda A Bell Chief Deputy*
CLERK OF THE TRIAL COURTS
*Per Judge Gleason's Order dated 7/6/04*

AFTER RECORDING
Return to: Moshe Calberg Zorea
PO Box 212043
Anchorage, AK 99521

*Subscribed and Sworn before me at Anchorage Alaska on July 9th, 2004*

*Graham Adams, Deputy Clerk*

I certify that 7-9-04 a copy of the above was mailed to each of the following at their addresses of record. ( List names if not an **agency**)

☐ CSED ☐ AG ☐ PD ☐ DA    *Copy - file Original - Zorea*

*S. Adams*
Deputy Clerk / Secretary

2 of 2
2004-021192-0

**2004-021193-0**
Recording Dist: 311 - Palmer
8/2/2004 11:35 AM Pages: 1 of 2



**MAT-SU TITLE INSURANCE AGENCY, INC.**
951 East Bogard Road, Suite 100, Wasilla, Alaska 99654
Phone: (907) 376-5294 Fax: (907) 376-1237 In State Toll Free: 1(877) 377-5294

MS61893

### STATUTORY WARRANTY DEED
### A.S. 34.15.030

The Grantor,

George Stepanov, an _Unmarried_ person, whose address is:
4155 Kingston Dr, Anchorage AK 99504-4440
for and in consideration of Ten Dollars ($10.00); and other good and valuable consideration, in hand paid, the receipt of which is hereby acknowledged, conveys and warrants to the Grantees,

Douglas L. Habersetzer and Donna M. Habersetzer, husband and wife, as Tenants by the Entirety, with rights of survivorship, whose address is P O Box 874302 Wasilla, AK 99687, the following described real property:

Parcel No. 1
The Southeast one-quarter of the Northwest one-quarter (SE¼ NW¼) and Government Lots 1, 2 and 4, EXCEPTING THEREFROM:
Begining at the southwest corner of Lot 4, thence North along the West Boundary of Lot 4 275 feet; thence Easterly, parallel with the North boundary of Lot 4, 175 feet; thence Southerly, parallel with the West boundary of Lot 4, 200 feet, more or less, to the meander of Lake Blodgett; thence Westerly, along the meander of Lake Blodgett, 185 feet, more or less, to the point of beginning;
all in Section 8, Township 17 North, Range 2 West, Seward Meridian, located in the Palmer Recording District, Third Judicial District, State of Alaska;
FURTHER EXCEPTING THEREFROM:
North Shore Subdivision No. 1, Unit No. 2, according to Plat No. 66-33, located in the Palmer Recording District, Third Judicial District, State of Alaska:
AND FURTHER EXCEPTING THEREFROM:
Morriseau Subdivision, according to Plat No. 72-54, located in the Palmer Recording District, Third Judicial District, State of Alaska.

Parcel No. 2
Lot 28, North Shore Subdivision No. 1, Unit No. 2, according to Plat No. 66-33, located in the Palmer Recording District, Third Judicial District, State of Alaska.,

Subject to reservations and exceptions in U.S. and/or State of Alaska Patents and in Acts authorizing the issuance thereof; easements, right-of-ways, covenants, conditions, reservations, notes on plat, and all other restrictions of record, if any.

The Grantor warrants to Grantee(s) that the above-described real estate has never been used as a family home or homestead nor is same subject to any spousal claim as defined in A.S. 34.15.010.

Date: _July 30_ , 2004          Grantor:

George Stepanov

STATE OF ALASKA    }
                } ss
THIRD JUDICIAL DISTRICT }

The foregoing instrument was acknowledged before me on _July 30_____, 2004,
by George Stepanov.

STATE OF ALASKA
NOTARY PUBLIC
Anne M. Picard
My Commission Expires: 10-25-2007

Notary Public for Alaska
My Commission Expires: _10-25-2007_

Return to: Grantees

2 of 2
2004-021193-0



**2006-036772-0**
Recording Dist: 311 - Palmer
12/29/2006 9:03 AM Pages: 1 of 3

**WARRANTY DEED**
A.S. 34.15.030

MS-70689

The GRANTORS, DOUGLAS L. HABERSETZER AND DONNA M. HABERSETZER, husband and wife, whose mailing address is P.O. Box 874302, Wasilla, Alaska 99687, for and in consideration of TEN DOLLARS ($10.00) and other good and valuable consideration in hand paid, the receipt of which is hereby acknowledged, convey and warrant to GRANTEES, JAMES M. DAULT, an unmarried person, and SHALA DOBSON, an unmarried person, each as to an undivided 50% interest, as tenants in common, whose mailing address is P.O. Box 91016, Anchorage, Alaska 99509-1016, the following described real estate located in the Palmer Recording District, Third Judicial District, State of Alaska:

Lot 28, North Shore Subdivision No. 1, Unit No. 2, according to Plat No. 66-33, located in the Palmer Recording District, Third Judicial District, State of Alaska,

SUBJECT TO the reservations and exceptions as contained in U.S. Patent, including but not limited to the reservation of all uranium, thorium, or any other material which is or may be determined to be peculiarly essential to the production of fissionable materials, by instrument recorded September 10, 1954, in Book 11, at Page 96, in the Palmer Recording District, Third Judicial District, State of Alaska;

FURTHER SUBJECT TO the blanket easement granted to Matanuska Electric Association, Inc., by instrument recorded October 6, 1961, in Book 39, at Page 22, in the Palmer Recording District, Third Judicial District, State of Alaska;

FURTHER SUBJECT TO the reservation of one-half of the profits derived from any gas or oil, reserved by Ernest Raymond, as contained in instrument recorded October 1, 1962, in Book 43, at Page 215, in the Palmer Recording District, Third Judicial District, State of Alaska. The reserved interest of Ernest Raymond was conveyed to August Schele by instrument recorded March 7, 1968, in Book 7, at Page 318, in the Palmer Recording District, Third Judicial District, State of Alaska,. The interest of August Schele was conveyed to Cherry Colleen Terranova, in trust for the benefit of Laura Lynne Terranova, a minor, by instrument recorded March 2, 1981, in Book 228, at Page 687, in the Palmer Recording District, Third Judicial District, State of Alaska;

FURTHER SUBJECT TO the reservation of three-quarters of sellers one-half interest of the oil and gas rights, reserved by Freda C. Snyder, as contained in instrument recorded September 22, 1965, in Book 59, at Page 43, in the Palmer Recording District, Third Judicial District, State of Alaska;

FURTHER SUBJECT TO the conveyance of one-half of the oil and gas rights, including the terms and provisions thereof, by and between Helen P. Clements, as Grantor, and Joe L. Crumbly, as Grantee, by instrument recorded December 9, 1968, in Book 9, at Page 130, in the Palmer Recording District, Third Judicial District, State of Alaska;

FURTHER SUBJECT TO the easements as delineated on the plat of North Shore Subdivision No. 1, Unit No. 2;

FURTHER SUBJECT TO the notes on the plat of North Shore Subdivision No. 1, Unit No. 2; and

WARRANTY DEED
M4223\125\DOT

PAGE 1 OF 3.

FURTHER SUBJECT TO the rights of the public and/or governmental agencies in and to any portion of said premises lying below the mean high water line of Blodgett Lake.

DATED this 24 day of July, 2006.

GRANTORS: DOUGLAS L. HABERSETZER AND
DONNA M. HABERSETZER

_____
Douglas L. Habersetzer

_____
Donna M. Habersetzer, by Douglas L. Habersetzer,
attorney-in-fact for Donna M. Habersetzer

STATE OF ALASKA      )
                     )  ss.
THIRD JUDICIAL DISTRICT  )

The foregoing instrument was acknowledged before me this 24 day of July, 2006, by **DOUGLAS L. HABERSETZER, INDIVIDUALLY AND AS ATTORNEY-IN-FACT FOR DONNA M. HABERSETZER.**

_____
Notary Public in and for Alaska
My Commission Expires: _____

OFFICIAL SEAL
PATRICIA R. LIVINGSTON
Notary Public-State of Alaska
My Comm. Expires 03-20-2010

After recordation return to:

James Dault and Shala Dobson
P.O. Box 91016
Anchorage, AK 99509-1016

WARRANTY DEED          PAGE 2 OF 3
M4223\125\DOT

2 of 3
2006-036772-0

Grantee(s) has inspected the real estate conveyed herein and all appurtenances thereunto appertaining and accept same "as is" without any warranty from Grantor(s), implied or expressed, of any type or nature whatsoever other than as to the title which is expressly warranted by this deed.

DATED this 28th day of DECEMBER , 2006.

GRANTEES: JAMES M. DAULT and SHALA DOBSON

_____
JAMES M. DAULT

_____
SHALA DOBSON

STATE OF ALASKA          )
                         )  ss.
THIRD JUDICIAL DISTRICT  )

The foregoing instrument was acknowledged before me this 29 day of December , 2006, by JAMES M. DAULT and SHALA DOBSON.

_____
Notary Public in and for Alaska
My Commission Expires: _____

"OFFICIAL SEAL"
PATRICIA R. LIVINGSTON
Notary Public-State of Alaska
My Comm. Expires 03-20-2010

WARRANTY DEED          PAGE 3 OF 3
M4223\125\DOT

3 of 3
2006-036772-0